UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

——————————————————————— x

DENNIS C. VACCO and JOSEPH E. BERNSTEIN,
individually in their capacities as Litigation Trustees
of the CATSKILL LITIGATION TRUST,

       Plaintiffs,

      -against-             07 Civ. 00663
                          (TJM/DEP)
HARRAH'S OPERATING COMPANY, INC., and
CLIVE CUMMIS,

       Defendants.

——————————————————————— x


**OPPOSITION TO MOTION TO DISMISS COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .......................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.  THE TRUSTEES HAVE STANDING TO SUE ON THE JUDGMENT ...................... 3

    A.  The Tribal Court is functioning with the full support of the Tribe........................ 3

    B.  The Assignment of the Judgment was recently approved by the Tribal
        Court, which has exclusive jurisdiction to decide if the Assignment is
        valid.......................................................................................................... 4

    C.  This Court must defer to the Tribal Court in interpreting Mohawk law on
        champerty................................................................................................... 5

    D.  Even if New York's unusually restrictive law were used as a guide, the
        Assignment is not champertous ................................................................... 5

        1.  Assignment to an interested entity is excepted ......................................... 6

        2.  The Assignment did not stir up any litigation; the Trust had
            independent business reasons for effecting the Assignment...................... 7

        3.  Transfers of judgments and debt collection rights are explicitly
            excepted from champerty restrictions ...................................................... 8

II.  THE CLASS ACTION JUDGMENT REMAINS UNSATISFIED, AS THE
    PARTIES HAVE ACKNOWLEDGED AND THE TRIBAL COURT
    RECENTLY RECOGNIZED ................................................................................. 9

    A.  Various parties came close to settling the three actions that arose out of the
        Tribal Court Action..................................................................................... 9

    B.  The parties *required* a settlement agreement signed by *all* of the various
        parties, before anyone would be bound.  Complete signatures were not
        obtained, and the *Defendants'* attorneys have recently confirmed the
        materiality of this requirement.................................................................... 11

    C.  The judgment creditors did not put a complete settlement in any Court's
        record and have repeatedly confirmed that a settlement was never reached,
        let alone implemented ................................................................................. 14

    D.  The parties also required further Tribal Court action.  Even if the prior
        actions in *this* Court were agreed to be settled, the Tribal Court Action is a
        class action, and the Tribal Court never approved the settlement proposal......... 15

**TABLE OF CONTENTS**
**(continued)**

Page

III.  THE TRIBAL COURT IS THE FORUM IN WHICH THE DEFENDANTS WERE OBLIGATED TO LITIGATE THE TWO ISSUES RAISED IN THE MOTION.................................................................................................. 18

  A.  The Tribal Court was recently asked by the Trustees to affirm that the Judgment remains viable, and the Defendants, parties to that motion, did not raise in that court any alleged settlement...................................... 18

  B.  The Defendants had an opportunity to litigate in the Tribal Court the issues raised in the Motion................................................................... 19

  C.  The Tribal Court system is the exclusive arbiter of those issues......................... 20

  D.  To any extent this Court concludes that either of the issues raised in the Motion remains unresolved, this Court should abstain and certify the issue to the Tribal Court for resolution under Mohawk law ......................................... 21

IV.  THE MOTION IS A PREMATURE AND DEFECTIVE MOTION FOR SUMMARY JUDGMENT ............................................................................. 22

CONCLUSION....................................................................................................... 24

OHS West:260297109.5

# TABLE OF AUTHORITIES

**Page(s)**

## Case Authority

FEDERAL CASES

*Alfadda v. Fenn,*
   966 F.Supp. 1317 (S.D.N.Y. 1997) ................................................................. 20

*Basil Cook Enters., Inc. v. St. Regis Mohawk Tribe,*
   117 F.3d 61 (2d Cir. 1997)................................................................. 20, 21

*Bowen v. Doyle,*
   230 F.3d 525 (2nd Cir. 2000) ................................................................. 21

*Chambers v. Time Warner, Inc.,*
   282 F.3d 147 (2d Cir.2002)................................................................. 23

*DiBella v. Hopkins,*
   403 F.3d 102 (2d Cir. 2005)................................................................. 22

*Elliott Assocs., L.P. v. Banco de la Nacion & epublic of Peru,*
   194 F.3d 363 (2d Cir. 1999)................................................................. 8

*Global Network Comm'ns, Inc. v. City of New York,*
   458 F.3d 150 (2d Cir. 2006)................................................................. 23

*Iowa Mut. Ins. Co. v. LaPlante,*
   480 U.S. 9 (1987)................................................................. 20, 22

*Leather v. Eyck,*
   180 F.3d 420 (2d Cir. 1999)................................................................. 20

*Morris v. Schroder Capital Mgmt. Int'l.,*
   445 F.3d 525 (2d Cir. 2006)................................................................. 22

*Parklane Hosiery Co. v. Shore,*
   439 U.S. 322 (1979)................................................................. 20

*Riley v. Town of Bethlehem,*
   5 F.Supp.2d 92 (N.D.N.Y. 1998)................................................................. 24

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

STATE CASES

*American Hemisphere Mktg. Agencies, Inc. v. Kreis,*
    40 Misc. 2d 1090 (N.Y. Sup.Ct., 1963) ............................................................. 7

*Bellarno Int'l Ltd. v. Irving Trust Co.,*
    165 A.D.2d 809 (1st Dep't. 1990) ..................................................................... 8

*Coopers & Lybrand v. Levitt,*
    52 A.D.2d 493 (1st Dep't. 1976) ....................................................................... 6

*First Natl. Bank of Bay Shore v. Felder,*
    69 Misc. 2d812 (Suffolk Dist. Ct. 1972) ........................................................... 8

*Klein v. Robert's Am. Gourmet Food, Inc.,*
    28 A.D.3d 63 (2d Dep't 2006) ......................................................................... 15

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.,*
    280 A.D.2d 208 (1st Dep't 2001) ...................................................................... 6

*Rosenkrantz v. Berlin,*
    65 Misc.2d 320 (N.Y.Sup.Ct., 1971) ................................................................ 8

*Rosenkrantz v. Salvo Realty Corp.,*
    65 Misc. 2d 467 (N.Y. Sup.Ct., 1971) .............................................................. 8

*Woodrow v. Colt Indus., Inc. (In re Colt Indus. S'holder Litigation),*
    155 A.D.2d 154 (1st Dep't 1990) .................................................................... 16

**Statutory Authority**

New York Judiciary Law

    Section 489 .................................................................................................... 6, 8

RULES

Federal Rules of Civil Procedure

    Rule 12 ................................................................................................... 2, 22, 23

OHS West:260297109.5

# TABLE OF AUTHORITIES
## (continued)

Page(s)

United States District Court, Northern District of New York Local Rules

    Rule 7.1 ................................................................................................................. 23, 24

OHS West:260297109.5

## INTRODUCTION

This is an action to enforce a judgment (the "Judgment") issued in 2001 by the Tribal Court (the "Tribal Court") of the Saint Regis Mohawk Tribe (the "Tribe") against Park Place Entertainment Corporation ("Park Place") and Clive Cummis ("Cummis.")  In 2005, Park Place merged into Harrah's Operating Company, Inc. ("Harrah's").[1]  Prior to issuing the Judgment, the Tribal Court certified the case there as a class action (the "Class Action") and designated the over 12,000 enrolled members of the Tribe as members of the class (the "Class").

As more fully described below, after a hearing on notice to the Class, the Tribal Court this past June approved an assignment (the "Assignment") of the Judgment to the Catskill Litigation Trust (the "Trust"), and the members of the Class became beneficiaries of the Trust. Later that month, plaintiffs Dennis C. Vacco and Joseph E. Bernstein, as Litigation Trustees (the "Trustees") of the Trust, filed herein their Complaint to Enforce Judgment (the "Complaint") against the Defendants.  The Trustees also filed a motion in the Tribal Court for clarification that Harrah's is the current name of the corporate judgment debtor and that over $1 billion is now owing on the Judgment.  After notice was given to the Defendants, that motion was granted by the Tribal Court in July.

The basis of the Judgment is the financial damage inflicted on the Class when the Defendants interfered, in April 2000, with the Tribe's contract to build a casino in Sullivan County, New York, right after key federal approval was obtained by the Tribe.  Given its close proximity to the New York metropolitan area, an hour closer to New York City than Atlantic City, New Jersey is, the Tribe's planned casino posed a serious competitive threat to Park Place. Park Place held the largest share of the Atlantic City gaming market, a position Harrah's continues to enjoy today.  *See* Declaration of Rachel Patience Ragni in Support of Request for Judicial Notice filed in Opposition to Motion to Dismiss ("Ragni Decl."), filed and served herewith, Exhibits 1 and 2.  Derailing the Tribe's project preserved Park Place's (and Harrah's)

---

[1] References to the "Defendants" in this Opposition are to Cummis and either Park Place or Harrah's, depending on whether the reference is to an event before or after the merger.

mid-Atlantic gaming market share, at great loss to the Tribe.

On August 13, 2007, the Defendants filed their Motion to Dismiss the Complaint Herein Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a Memorandum of Law in Support of Defendants' Motion to Dismiss (the "Memo"), and a Declaration of George F. Carpinello (collectively, the "Motion"), seeking the Court's dismissal of the Complaint, purportedly under Federal Rule of Civil Procedure 12(b)(6). The Defendants allege two defenses to the Complaint, both of which not only are factually and legally baseless, they have been eliminated as possible defenses to this action by the recent rulings of the Tribal Court, as the alleged defenses are wholly inconsistent with those rulings of the Tribal Court.

The Defendants' first defense is that the Trustees lack standing to sue on the Judgment, because it was acquired under a contract that the Defendants assert is illegal under a New York State statute. Not only does New York State law not apply to an assignment of a Tribal Court judgment, which is governed exclusively by the laws of the Tribe ("Mohawk Law"), but, even if New York's unusually restrictive law were to apply or be a guide, the assignment of the Judgment would be adjudicated to be perfectly lawful.

Next, the Defendants set out an argument that the Judgment was fully satisfied by an unexecuted and unperformed settlement that was in prospect in 2003 between the Defendants and a number of individual members of the Class, but in fact *not* the Class. The alleged settlement would have provided for the release of certain members of the Class, but it offered *no consideration or monetary compensation whatsoever to over 12,000 other members of the Class.* And very fundamentally, the proposed settlement was not reviewed by the Tribal Court for fairness, as required for settlement, compromise or abandonment of any class action. The Class members did not even receive notice of their individual right to opt out of an abandonment of their Judgment. *See* Declaration of Chief Barbara Lazore ("Lazore Decl."), filed and served herewith, ¶ 14.

Even as to settling the three actions, including two in this Court, that the Motion focuses on, each of which arose out of the Tribal Court Action, the Defendants' own Motion concedes

OHS West:260297109.5

that no settlement agreement was ever executed and delivered by the parties, as the parties required. No settlement was put in any court's record, as it was still in negotiation the last time it was referred to as being in prospect. Also, only certain individual members of the Class, not the entire Class, were listed as parties to the *proposed* settlement, and not all of them ever signed an agreement. They (and their attorneys) could not adequately represent the interests of the Class in a settlement, due to a conflict of interest inflicted upon them by the Defendants when they initiated a separate defamation action. *The settlement simply never took place*.

Finally, the Motion is not a motion to dismiss for failure of the Complaint to state a claim. The Motion is a premature motion for summary judgment, supported only by a voluminous sworn declaration of an attorney for the Defendants, and does not conform to the *mandatory* rules of this Court regarding motions for summary judgment.

The Motion should be denied. Among other reasons for denial, the issues raised are precluded. If, for any reason, the Motion is not denied, the Court should abstain and certify the issues raised in the Motion to the Tribal Court for resolution.

## ARGUMENT

### I.   THE TRUSTEES HAVE STANDING TO SUE ON THE JUDGMENT.

#### A.   The Tribal Court is functioning with the full support of the Tribe.

The Defendants' assertions in the Motion illuminate the reason this action has become necessary: the Defendants have nothing but contempt for the governmental institutions of Native American tribes, except when those institutions are being manipulated by the Defendants. The contempt that the Defendants have for the Tribe and its institutions is palpable in the Motion. On just the first page of the Memo, the Defendants' arrogance toward the Tribe's judiciary spews out as they refer to "a supposed tribal court," the "purported tribal court judgment" and "the purported tribal court action."

There is, however, no issue that the Tribal Court is functioning with the full support of the Tribe. On May 23, 2007, the Saint Regis Mohawk Tribal Council (the "Tribal Council") adopted Resolution #2007-41, implementing the Judiciary Act of 2007. *See* <u>Exhibit A</u> to

-3-

Declaration of Chief Lorraine M. White ("White Decl."), filed and served herewith. The Tribal Council is the executive and legislative branch of the Tribe's government, currently recognized by the Bureau of Indian Affairs of the United States Department of the Interior as the governing authority of the Tribe. White Decl. ¶ 6. In Resolution #2007-41, the Tribal Council described how earlier resolutions purporting to rescind a judiciary act enacted in 1994, to declare the Tribal Court non-existent and to nullify the Judgment, were invalid, *based on an investigation into*, among other things, *the conduct of the Defendants*. A copy of the written report of the investigation was adopted by the Tribal Court and is an exhibit to that resolution.[2]

Resolution #2007-41 also affirmed that the Tribal Court has been continuously valid since its inception and that the Judgment "remains in force and effect to this day." White Decl. Ex. A at 3 thereto.

**B.  The Assignment of the Judgment was recently approved by the Tribal Court, which has exclusive jurisdiction to decide if the Assignment is valid.**

On June 6, 2007, the Tribal Court issued an Order giving preliminary approval to the Assignment of the Judgment to the Trustees, in exchange for the Class receiving units of beneficial interest in the Trust. *See* Declaration of Dennis C. Vacco ("Vacco Decl."), filed and served herewith, ¶ 27.

The Court set a final hearing on the advisability of the Assignment, after requiring published notice to all 12,270 members of the Class. Vacco Decl. ¶ 27. On June 21, 2007, after the notice was provided and a further hearing was held, the Tribal Court issued its Order Approving Proposed Assignment of Class Action Judgment (the "Assignment Order"), giving final approval of the Assignment. Vacco Decl. ¶ 28 and Ex. D thereto.

The Defendants have asserted that the Trustees lack standing to bring the Action because of the allegedly champertous nature of a preliminary agreement, the "Joint Alliance Agreement." The Trustees, however, brought the Complaint based on the Assignment that was approved by

---

[2] Trustee and plaintiff herein Dennis C. Vacco is the author of this report (the "Vacco Report."). Also, the Trust reimbursed certain expenses that the Tribe incurred in connection with the investigation, including the fees of Mr. Vacco's firm. The Vacco Report was, however, written before Mr. Vacco became a Litigation Trustee of the Trust.

OHS West:260297109.5

the Tribal Court. *See* Complaint ¶ 29. The Joint Alliance Agreement itself, in addition to not being champertous, provided only for cooperation between the parties while efforts were made to achieve a legal and proper assignment, approved by the Tribal Court. *See* Vacco Decl. Ex. A thereto. If the Assignment had not been approved by the deadline set in the Joint Alliance Agreement, it would have expired in accordance with its own terms. *Id.*

In addition to Tribal Court approval, the Assignment was also approved by the Tribal Council, the official governing body of the Tribe. *See* Vacco Decl. Ex. D at 5 thereto.

As a result of the issuance of the Assignment Order, any challenge to the Assignment, *for any* reason, is now barred.

### C.   This Court must defer to the Tribal Court in interpreting Mohawk law on champerty.

The Defendants do not cite any provision of Mohawk Law that would make the Assignment (or the Joint Alliance Agreement) champertous. There is none. As discussed below, the New York statute on which the Motion relies is, in addition to being inapplicable to this matter, outside the mainstream of even American law and is interpreted narrowly by New York courts. It is therefore not surprising to find no champerty restrictions in Mohawk law, custom or traditions.

In any event, as discussed in section III of this Opposition, this Court must defer to the Tribal Court on any principle of Mohawk Law that may be disputed.

### D.   Even if New York's unusually restrictive law were used as a guide, the Assignment is not champertous.

The Defendants do not describe why the Assignment, from the members of the Class certified by the Tribal Court to a Trust organized under Delaware law, should be governed by New York State law. But, even if New York law on champerty, which is often described as antiquated or uniquely restrictive, were applied or used as a guide, the assignment would not be

champertous.[3]  The Trustees and the beneficiaries of the Trust are not strangers to the underlying dispute with the Defendants and had sound business reasons to merge their rights.  Additionally, assignments of judgments are exempted from the New York rule.

### 1.   Assignment to an interested entity is excepted.

New York State court decisions construing Judiciary Law § 489, which is cited by the Defendants as the basis of their argument, and its predecessor statute (Penal Law § 275) provide that an action is not champertous where the assignee is not a stranger to the underlying dispute.  For instance, in *Coopers & Lybrand v. Levitt*, 52 A.D.2d 493, 384 N.Y.S. 2d 804 (1st Dep't 1976), Dynamark assigned its claims against Lybrand to Poloron.  Poloron undertook to sue Lybrand on the claims assigned to it and agreed to pay 75% of the proceeds of any recovery to Dynamark which, in turn, agreed to bear 75% of the costs of prosecuting the lawsuit.  In a subsequent action, Lybrand asserted that the assignment of Dynamark's claims against it was a violation of Judiciary Law § 489.  In rejecting Lybrand's argument that the agreement was champertous, the New York Appellate Division, First Department, observed that the parties were simply joining forces to pursue a common interest:

> Both Dynamark and Poloron asserted a claim [against Lybrand] by reason of the alleged misstatements of Lybrand.  The fact that they agreed to proceed by one party instead of asserting two separate claims does not make the assignment champertous. . . .  The recovery sought was compensation for an alleged wrong and was not merely intended to stir up litigation which, apparently, was already underway.

*Coopers & Lybrand*, 52 A.D.2d at 497-498, 384 N.Y.S. at 807.

Similarly, in *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 280 A.D.2d 208, 216, 723 N.Y.S.2d 134, 139-140 (1st Dep't 2001), the Appellate Division, First Department,

---

[3] Judiciary Law § 489 was amended in 2004 as the latest in a series of narrowing amendments.  (That amendment eliminated from its coverage all claims purchased for at least $500,000.)  The Assembly Memorandum in Support noted:

> Section 489 sought to prohibit persons from acquiring claims for the primary purpose of commencing litigation to recover legal fees and costs.  This rule was initially established to prevent abusive litigation.  However, it has been almost universally repealed.  Today, § 489 makes New York one of only four states with any champerty statute, and unfortunately a statue which was intended to prevent abusive litigation has led to abusive litigation.

opined that section 489 applies only to a party uninvolved in the underlying dispute:

> [S]ection 489 prohibits an acquisition of a cause of action by a
> stranger to the underlying dispute . . . in consideration of a bargain
> for some part of the thing involved. . . . Thus, the question here is
> whether the investors are, as defendants allege, strangers to the
> dispute merely speculating on the suit or, as plaintiffs allege,
> parties seeking to protect interests of theirs that are financially
> related to the plaintiffs' interests.

(citations and internal quotation marks omitted.)  Similarly, in *American Hemisphere Mktg.*

*Agencies, Inc. v. Kreis*, 40 Misc. 2d 1090, 1091, 244 N.Y.S.2d 602, 603 (N.Y. Sup. Ct., 1963),

the court did not find champerty where the plaintiff and its assignor were interrelated

corporations and it was clear that the plaintiff had been involved in the transactions from the very

beginning.

   The Trustees are not strangers to the Judgment.  As complained of on page one of

the Defendants' own Memo, the Trust already held closely related claims, pending against the

Defendants at the time that it acquired the right to enforce and settle the Judgment.  Through the

Assignment, all of the parties harmed by the Defendants' tortious behavior in interfering with the

Tribe's casino project have aligned their interests.  All of the 12,240 enrolled members of the

Class remain entitled to participate in the original Judgment, as they became beneficiaries of the

Trust, concurrently with the Trust's acquisition of the Judgment.

   **2.**  **The Assignment did not stir up any litigation; the Trust had
independent business reasons for effecting the Assignment.**

   The Complaint is based on an assignment of a final Judgment, not an assignment

of unlitigated claims that might not result in a lawsuit absent the Assignment.  The effect of the

Assignment was to merge the *adjudicated* rights of the Class with the resources of the Trust, on

terms *expressly* approved by the Tribal Court as proper and fair to the Class.  Vacco Decl. as

Ex. D thereto.

   Moreover, as recited in the Joint Alliance Agreement, the pending leveraged

buyout of Harrah's and its affiliates (the "Harrah's LBO") placed the Class and the Trust

potentially at odds.  Without coordination of their rights, the Class and the Trust would be

-7-

seeking separate recoveries from assets that are to become heavily encumbered in the Harrah's LBO.  The merger of the rights of the Class and the Trust aligned their common interests.

**3.      Transfers of judgments and debt collection rights are explicitly excepted from champerty restrictions.**

Under both New York statutory and case law, transfers or assignments of *judgments* simply do not fall within the ambit of Judiciary Law § 489.  Judiciary Law § 489 is consistently construed not to apply to an assignment of a money judgment.  *See Rosenkrantz v. Salvo Realty Corp.*, 65 Misc. 2d 467, 317 N.Y.S.2d 809 (N.Y. Sup.Ct., 1971); *see also Bellarno Int'l Ltd. v. Irving Trust Co*., 165 A.D.2d 809, 560 N.Y.S.2d 287 (1st Dep't. 1990) (assignment not champertous where assignee was not stranger to underlying transaction and assignment made for purpose of facilitating recovery for an alleged wrong in an action already commenced and pending); *see also Rosenkrantz v. Berlin,* 65 Misc.2d 320, 321, 317 N.Y.S.2d 704, 705 (N.Y.Sup.Ct., 1971) (Section 489 "is construed to prohibit, by its wording, *the transfer of claims prior to the institution of any proceeding or action*. . . . I find nothing in the statute, however, prohibiting an attorney from buying a judgment, for the purpose of issuing an execution thereon, and collecting the debt . . . .")[4]

Indeed, New York law expressly provides that a *judgment* for a sum of money *can* be transferred.  *First Natl. Bank of Bay Shore v. Felder*, 69 Misc. 2d 812, 816, 331 N.Y.S.2d 306, 311 (Suffolk Dist Ct. 1972) (observing that *transfers of judgments* do not run afoul of Judiciary Law § 489 as they *are specifically permitted* under New York General Obligations Law §13-103).

Moreover, acquisition of even an unadjudicated debt with the intent to bring suit against a debtor is not a violation of Judiciary Law § 489, if the suit is brought for the primary purpose of collecting the debt.  *Elliott Assocs., L.P. v. Banco de la Nacion & Republic of Peru*, 194 F.3d 363 (2d Cir. 1999).

---

[4]  Except as otherwise noted, all emphasis in this Opposition is added.

There is therefore nothing illegal or improper about the Assignment under any law. The Assignment conferred proper and sufficient standing on the Trustees, effective upon the Assignment being approved by the Tribal Court.

## II.   THE CLASS ACTION JUDGMENT REMAINS UNSATISFIED, AS THE PARTIES HAVE ACKNOWLEDGED AND THE TRIBAL COURT RECENTLY RECOGNIZED.

### A.   Various parties came close to settling the three actions that arose out of the Tribal Court Action.

The Motion focuses on three actions arose out of the Judgment and the Tribal Court Action, rather than on the Tribal Court Action. This is not surprising.

The Defendants' disregard for the members of the Tribe and disrespect for the Tribe's institutions have been apparent for some time. Instead of continuing with defending itself in the Tribal Court, *after* they made personal appearances there and moved to dismiss the action *on the merits*, Park Place, one of the world's richest companies, launched a multi-prong attack on the impecunious Class representatives and their lawyer.

First, the Defendants, in *Park Place Entertainment Corp., et al. v. Arquette, et al.*, Civil Action No. 00-CV-0863 (TJM) (DEP) in this Court (the "Injunction Action"), on June 2, 2000, sued for an injunction of further prosecution of the Tribal Court Action. The Defendants named the members of the Class who had initiated the Class Action, but not the Class. That action did not go as the Defendants hoped. On September 18, 2000, this Court dismissed the Injunction Action for lack of subject matter jurisdiction, noting that the Tribal Court Act was of a type that would generally be proper. The Defendants appealed that order.

Rather than return to the Tribal Court or let the federal appellate process work, the Defendants turned quickly to the New York State court. On March 29, 2001, they filed *Park Place Entertainment Corp. et al. v. Arquette, et al.*, AS #16-1-2002-0044, Index No. 2002-79 (the "State Court Action"), in the Supreme Court of the State of New York, Franklin County.[5] In

---

[5] *See* Ragni Decl. Exhibit 8. In his paragraph 13 of Mr. Carpinello's sworn Declaration, he represents that the State Court Action was commenced in January, 2002. This inaccurate date makes the filing of the State Court Action appear to be a reasonable reaction to the Prior Enforcement Action (hereinafter defined). His statement is false. The timing reflects that the State Court Action was an end-run around the ruling of *this* Court in the Injunction Action.

one of the more heavy handed tactics in the annals of American law, the Defendants, in the State Court Action, piled on against the Class representatives and their lawyer and threatened them with personal liability for defamation damages, for pursuing their claims through the Tribal Court, although the Tribal Court had been active for six years and had a robust roster of cases at the time. *See* White Decl. ¶ 6 and Ex. A thereto. This exposure had an additional benefit to the Defendants in creating a conflict of interest between those parties and counsel, on the one hand, and the vast majority of the Class, on the other hand, in creating a motivation for those personally facing the ominous wrath of Park Place and the war chest at the disposal of their numerous attorneys to try to reach some kind – any kind – of settlement.

In response to these multiple attacks and attempts to end-run this Court *and* the Tribe's judiciary, the individuals who had been sued by the Defendants on June 27, 2001, countered in this Court with *Arquette, et al. v. Park Place Entertainment Corp., et al.*, Civil Action No. 01-CV-1058 (TJM) (DEP) (the "Prior Enforcement Action" and, together with the Injunction Action, the "Prior District Court Actions"). These members of the Tribe acted without authorization of the Tribal Court. Vacco Decl. ¶ 20.

That multi-court onslaught, together with other shocking activities by the Defendants and their lawyers, which are **set out in detail and with irrefutable substantiation in the Vacco Report**, succeeded in *stopping* the Prior District Court Actions. But those activities (1) did *not* cause the Tribal Court Action to be dismissed, (2) did *not* cause the Judgment to be vacated, (3) did not cause the State Court Action to be dismissed, and (4) did *not* cause any claims to be released. The Prior District Court Actions were dismissed by this Court, *sua sponte* and without prejudice, but the settlement being discussed was not completed or implemented.

While many of the individuals facing the Defendants' well-financed wrath may have been willing to abandon the Prior Enforcement Action, a settlement was never ultimately finalized, due to, among other things, the steadfastness of some individuals who simply refused to sign. In the Motion, the Defendants have described the terms of a proposed settlement in a draft Settlement Agreement and Release (the "Proposal"), under which they were to pay *nothing*

on the $1.78 billion final Judgment.  But no settlement agreement was executed or submitted to

the Tribal Court for a determination of fairness.  Lazore Decl. ¶¶ 12-14.  *Because there was*

*nothing fair about it, it did not come to fruition.*

> **B.    The parties *required* a settlement agreement signed by *all* of the various parties, before anyone would be bound.  Complete signatures were not obtained, and the *Defendants'* attorneys have recently confirmed the materiality of this requirement.**

It is clear from the correspondence written by the Defendants' lawyers at the time, and

repeated only months ago, as opposed to what they assert now, that signatures on a written

agreement were *essential* to the parties.  Until that was accomplished, no one was to be bound.

Until then, as reflected in correspondence during the drafting of the Proposal, it was *clearly*

understood by counsel that the documents were for settlement purposes only and that they would

not "prejudice any position the parties may take if a settlement cannot be reached." *See*

Declaration of Michael Rhodes-Devey  ("Rhodes-Devey Decl."), filed and served herewith,

Exhibit A.

The Defendants embraced that view.  Even now, in footnote 4 of their Memo in support

of the Motion, the Defendants acknowledge that the *parties*, not merely counsel, needed to

approve and then sign the final version of the Proposal.

Consistent with this view, on June 1, 2004, the *Defendants'* lead attorney in the State

Court Action and in the Injunction Action in this Court, Jonathan M. Hoff, Esq. of Cadwalader,

Wickersham & Taft LLP, wrote a letter to Justice David Demarest, presiding in the State Court

Action.  Rhodes-Devey Decl. ¶ 13 and Ex.  B thereto.  In this letter, Mr. Hoff provided a

response to that court regarding the status of the State Court Action and the Proposal, explaining:

> Plaintiffs [the Defendants herein] have executed the settlement
> agreement and are prepared to exchange fully executed signature
> pages with defendants and proceed with the settlement of this
> action.  Plaintiffs do not wish to continue to waste the time and
> resources of the parties and the Court by continuing the litigation.
> However, notwithstanding their desire to achieve a settlement,
> until *all* the defendants execute the settlement agreement **and**
> exchange signature pages with plaintiffs **and** appropriate steps are
> taken to vacate the "Tribal Court" order, plaintiffs have no choice

> but to request that this case remain on the Court's docket until such
> time as the settlement agreement is finalized.

*Id.*

Indeed, as recently as December 5, **2006**, in another letter to Justice Demarest regarding

the status of the State Court Action, Mr. Hoff affirmed that the Proposal was still not a *binding*

settlement.  Rhodes-Devey Decl. ¶ 14 and Ex. C thereto. In that letter, merely nine months ago,

Mr. Hoff, again confirmed:

> As described in my June 1, 2004 letter to the Court, the parties to
> this action had reached a settlement of the litigation.  As also set
> forth in my June 1, 2004 letter, the defendants had not signed the
> settlement agreement. . . .  As of this date, the status of the
> settlement agreement has not changed. . . .  Plaintiffs [the
> Defendants herein] appreciate the Court's patience and
> consideration in connection with the resolution of this matter.
> However, *until the settlement is finalized, plaintiffs are not
> prepared to abandon their claims*.  Plaintiffs, therefore, request 60
> days to finalize the settlement agreement.  If the settlement
> agreement is not finalized within 60 days, *plaintiffs intend to
> proceed with the litigation*.

*Id.*

Even though the Defendants asserted the right to proceed with their (and, it follows, all

related) litigation in *December, 2006*, due to the lack of required signatures, they unabashedly

now represent to this Court that "the law is clear that the agreement of counsel made on March

31, *2002* is a binding settlement . . . ," so signatures and the other requirements of the Proposal

are superfluous.  Memo p. 2.  To make the argument that complete signatures were not required,

the Defendants have abandoned the prior insistence and now assert that the lawyers could bind

everyone, somehow even the certified Class, in a patently self-serving manner.  On February 8,

2007, Mr. Hoff sent another letter to Justice Demarest, advising the court that, "[u]pon reviewing

the circumstances concerning the litigations between the parties, it is plaintiffs' position that

these disputes have been settled, notwithstanding defendants' failure to execute a settlement

agreement."  Rhodes-Devey Decl. ¶ 16 and Ex. E thereto.

Mr. Hoff did not offer any explanation as to why the Defendants' position on the

Proposal's status was suddenly completely opposite from what it had been just two months

before.  The answer is that, on January 16, 2007, attorneys for the Tribe sent a letter to the Board

of Directors of Harrah's, requesting assurances that, in connection with Harrah's LBO, Harrah's

will be making proper disclosures regarding the Judgment issued by the Tribe's judicial

institutions.  *See* White Decl. Ex. C thereto.  This apparently was interpreted by the Defendants

as an indication that efforts to enforce the Judgment were about to resume in earnest.

Accordingly, on February 9, 2007, Mr. Rhodes-Devey, the attorney for the Class in the

Class Action and for the named defendants in the Injunction Action, and representing himself

*pro se* as a defendant in the State Court Action, sent a letter to Justice Demarest, politely laying

bare the baselessness of Mr. Hoff's change of position:

> However, Mr. Hoff appears to be seeking a dismissal of the action, including my co-defendants' counterclaims, without giving them notice.
>
> I could very easily be mistaken, and perhaps this matter has been settled as Mr. Hoff alleges.  If he would be so kind as to provide the Court and myself with a copy of the Stipulation signed by the parties or their counsel, or a transcript of a settlement placed on the record in open court, then surely the action can be dismissed.
>
> However, since I am fairly certain such documents [sic] exists, I think Mr. Hoff should not maintain such positions that assert material factual statements that are false and are completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law.

Rhodes-Devey Decl. Ex. F thereto.[6]

During the intervening period, Defendants were more candid than they are now in the

Motion, with regard to the status of the Proposal.  For example, in advising the investing public,

under the sanctions of the U.S. Securities & Exchange Commission (the "SEC"), Park Place was

consistent that a signed agreement was required to complete the matter.  In its SEC Form 10-K

for *2003*, and again for *2004* (the last 10-K filed prior to its merger with Harrah's), Park Place

confirmed there had been no final settlement: "A settlement agreement has been circulated for

---

[6] It bears noting that, in addition to Mr. Rhodes-Devey obviously does not believe that any settlement has become binding or agreed to, the references in the Memo, including the very specific assertion in footnote 5 of the Memo, that he was the lawyer for the plaintiffs in the Prior Enforcement Action and for the defendants in the State Court Action are categorically false.  *See* Rhodes-Devey Decl. ¶¶ 4 and 10.

OHS West:260297109.5

signature by all the plaintiffs. Although a signed settlement agreement has not been exchanged, the Court has discontinued the action *without prejudice*." Ragni Decl., Exhibits 3 and 4.

> **C.    The judgment creditors did not put a complete settlement in any court's record and have repeatedly confirmed that a settlement agreement was never completely reached, let alone implemented.**

Knowing the required signatures simply were not exchanged, the Defendants rely heavily in the Motion on the general discussion of the Proposal, in a conference before Magistrate Judge Peebles on March 31, 2003. But the Proposal was then just an *outline*.

The Defendants point to one letter prepared by the *Defendants* and co-signed by Mr. Rhodes-Devey, who was counsel for the Class in the Class Action and for the named defendants in the Injunction Action, but *not* counsel for the plaintiffs in the Prior Enforcement Action. The Defendants downplay that, on May 15, 2003, Henry M. Greenberg, Esq., who was counsel for the plaintiffs in the Prior Enforcement Action, in a letter to Magistrate Judge Peebles in that case, stated that " . . . the settlement of *Park Place v. Arquette* and *Arquette v. Park Place* has not yet been completed." *See* Declaration of George F. Carpinello Declaration ("Carpinello Decl.") Exhibit K.

In any event, Mr. Rhodes-Devey, in a letter dated December 12, 2006, to the State Court clarified:

> While the attorneys had reach [sic] a settlement in principal [sic], to my knowledge, no settlement was reached. I was never able to get the signature of all required parties to the settlement which the Plaintiff [Harrah's] demanded that I get by a certain date (some 3 years ago).
>
> Plaintiff's [sic] have never tendered a signed settlement agreement to Defendants and the Defendants have never tendered a signed settlement agreement to the Plaintiffs.
>
> Reference is made to CPLR Rule 2104. An agreement is not binding upon a party unless it is placed on the record in open court, the agreement is reduced to writing and subscribed by the parties or their attorneys, or it is reduced to the form of an order and entered.
>
> Notably, the Federal litigation was dismissed by the Court without prejudice in the event the settlement did not occur, which it did not. Copies of the Federal Judgments and court's minutes

noting the settlement are attached.

Rhodes-Devey Decl. Ex. D thereto.

Mr. Rhodes-Devey was referring to the fact that, although the Proposal was, in general terms, discussed with this Court, that does not make it *effective*, even with regard to the Prior District Court Actions. A *full-blown* description of a settlement was not put in the Court's record, precisely because **the Proposal had not been finalized**. *See Klein v. Robert's Am. Gourmet Food, Inc.*, 28 A.D.3d 63, 70-71, 808 N.Y.S.2d 766, 772-773 (2d Dep't 2006). As the Defendants correctly emphasize in footnote 8 of their own Memo, each party to the Prior District Court Actions had to sign the settlement, even for the Proposal to be effective in *those* actions. And, at the time of that conference in this Court, the attorneys were still drafting, as the Minute Entry of the status conference held on March 31, 2003 reflects. Carpinello Decl. Ex. G thereto. Furthermore, as emphasized by the Defendants in their Memo, the *parties* still needed to approve and sign the attorneys' work product.

**D.    The parties also required further Tribal Court action.  Even if the prior actions in *this* Court were agreed to be settled, the Tribal Court Action is a class action, and the Tribal Court never approved the settlement proposal.**

Even if conversations and correspondence cited by the Defendants were intended to have an impact in this Court, the Judgment, having been entered in a class action, was not something that could not be disposed of by such informal (or even formal) agreement of counsel.

In the Motion, the Defendants focus on the immateriality of the failure of one *named* party to sign the Proposal. But, in actuality, *all* parties expressly reserved that the Proposal would not be a binding settlement until *all* critical steps occurred. In a letter of June 30, 2003, from the Defendants' counsel to this Court, they stated that, even *if* essentially all signatures are obtained,

> it is *necessary* for certain steps to take place *before* final settlement can occur.  Specifically, the tribal litigants have agreed to *vacate* and discontinue a certain tribal class action. *Once that is completed*, all the parties will execute stipulations and will exchange releases.

-15-

*See* Carpinello Decl., Ex. N thereto.  That very clear position that the Proposal was *strictly* conditioned was made the basis of an extension in this Court of a previously set deadline, which was granted by this Court on July 17, 2003.  On March 8, 2001, the Tribal Court adopted New York State law and procedures for the class actions aspects (but no other aspect) of the Tribal Court Action.  Lazore Decl. ¶ 6 and Ex. A thereto.  On March 16, 2001, the Tribal Court ordered that the Tribal Court Action is a class action and certified the Class.  Lazore Decl. ¶ 7 and Ex. B thereto.

Accordingly, **the Defendants *admitted*** in the Prior District Court Actions, **that the Judgment is "unequivocally a class action judgment** on behalf of all 9000 [sic] registered members."  Ragni Decl. Ex. 7 thereto.

The Defendants therefore knew at that time the Proposal was being negotiated that Article 9 of the Civil Practice Law & Rules of New York, governing class actions, had been ordered to apply in the Tribal Court Action, by the Tribal Court's Order dated March 8, 2001.  Lazore Decl. ¶ 6 and Ex. A thereto.  Rule 908 in that Article has a *mandatory* procedure for discontinuance or any similar disposition of a class action:

> A class action *shall not* be dismissed, discontinued, or
> compromised without the approval of the court.  Notice of the
> proposed dismissal, discontinuance, or compromise *shall* be given
> to *all* members of the class in such manner as the court directs.

In the Judgment, the Tribal Court explicitly retained jurisdiction over the notification process.  *See* Complaint, fn. 1 at 3.

**It is undisputed that the Proposal was *never* reviewed or approved by the Tribal Court.**  A fairness hearing pursuant to Rule 908 was *never* conducted in the action, which the Defendants concede is a class action.

Case law mandates that these requirements be *strictly* enforced.  *See Woodrow v. Colt Indus., Inc.* (*In re Colt Indus. S'holder Litigation*), 155 A.D.2d 154, 160, 553 N.Y.S.2d 138, 141-142 (1st Dep't 1990), *modified on other grounds*, 77 N.Y.2d 185, 565 N.Y.S.2d 755 (1991).  In adhering to the requirements in Rule 908, the certifying court must carefully analyze several

-16-

components in considering approval of a class action settlement: 1) the likelihood of success, similar to the analysis for a motion for preliminary injunction; 2) the extent of support from the parties, including the number of objectors and nature of objections; 3) the recommendation and experience of counsel; 4) bargaining in good faith; 5) the complexity of the issues of law and fact; and 6) expense and the duration of litigation. *Id.*

Consistent with all of the foregoing, the Proposal attached as <u>Exhibit J</u> to the Carpinello Declaration filed in support of the Motion, does not make dismissal of the Tribal Court action merely a condition. **Dismissal of the Tribal Court Action was the keystone of the Proposal.** Without it, the whole arrangement to resolve the Class Action was structured to collapse. And it did.

For example, Section 2 of the Proposal deals with the dismissal of the Prior District Court Actions and the State Court Action. These cases were to be dismissed only "*after* the entry of the stipulation and order vacating the Judgment in the Tribal Class Action...." Although the Prior District Court Actions were dismissed, the dismissals were *sua sponte* and *without prejudice*. And the State Court Action remains unresolved.

Even more crucially, Section 5 of the Proposal specifies that the releases "shall become effective upon the vacating of the judgment of [sic] the Tribal Class Action...." So, regardless of what attorneys said or what some individuals may have agreed to sign, it is undeniable that **there has been no release of the claims** at issue in the action now at bar.

Accordingly, on March 4, 2003, the Defendants' counsel wrote to opposing counsel in the Prior District Court Actions. In that letter, the *Defendants'* counsel demonstrated plainly that they saw an *agreement to settle* the Prior District Court Actions as *just the first step*. *See* Vacco Decl. Ex. C thereto. In that letter, the Defendants' counsel noted that *they* had revised the draft settlement agreement to require that all members of the Class become bound and that the Judgment be vacated, as *essential* conditions of the Proposal: "[w]e have amended Paragraph 1 to apply the dismissal to all members of the class since the action was certified as a class in the

tribal court. . . . [W]e have also amended Paragraph 1 to require the tribal officials to take all actions necessary to ensure the judgment is vacated." *Id.* [7]

The Proposal never became a binding settlement in *any* action. And it is beyond peradventure that it never became binding on the Class and the Judgment was never released.

The Judgment has not been vacated, and it should now be enforced by this Court.

## III.    THE TRIBAL COURT IS THE FORUM IN WHICH THE DEFENDANTS WERE OBLIGATED TO LITIGATE THE TWO ISSUES RAISED IN THE MOTION.

### A.    The Tribal Court was recently asked by the Trustees to affirm that the Judgment remains viable, and the Defendants, parties to that motion, did not raise in that court any alleged settlement.

On June 22, **2007**, the Defendants were given seventeen days notice of the Trustees' motion in the Tribal Court (1) for an amendment of the caption, to reflect that Harrah's is the current name of the corporate entity that is a judgment debtor, and (2) to clarify the amount of interest that has accrued on the unsatisfied Judgment. Vacco Decl. ¶ 30. A hearing was held on this motion, at which the Defendants failed to appear, resulting in an Order dated July 12, 2007 (the "Interest Order"). *See* Vacco Decl. Ex. G thereto.

The Defendants have not always failed to appear in the Tribal Court in that case. In fact, when the Tribal Court Action was initially brought, the Defendants submitted themselves to the jurisdiction of the Tribal Court, had their lawyers admitted to practice there, and made a *motion to dismiss the case on the merits.* Vacco Decl. ¶ 10 . In their motion to dismiss the Tribal Court Action, the Defendants expressly reserved jurisdictional challenges for another day. But they

---

[7] The Defendants' counsel, in fact, had, on an earlier occasion, attempted to include language in an initial draft of the proposed settlement agreement that would purport to bind the Class. Counsel for the Class and counsel for certain class members in the Prior District Court Actions apparently did not agree, because that provision was removed through a later draft. Vacco Decl. Ex. B thereto. The final version of the Proposal thereby implicitly concedes there must be Tribal Court approval of the type customary in class actions. The Class had to be notified, and the Tribal Court had to review the Proposal for fairness to the Class. The draft settlement agreement did not provide that the tribal litigants "agreed to vacate" the Judgment in Tribal Court, as Mr. Carpinello represented then, or that they "committed" to do so, as the Defendants now assert in the Motion, but they would simply "seek to" do so. The tribal litigants could not, of course, impose an obligation on the Tribal Court in its ultimate determination of fairness of the settlement to the Class, nor could they assure the Defendants that the Class members would not opt out of the settlement in all events, given there was no consideration whatsoever flowing to them from the proposed settlement.

OHS West:260297109.5

never returned, even after failing to obtain in this Court (or the Second Circuit on appeal) an injunction against the Tribal Court proceedings.

The leniency employed by the Tribal Court, in extending opportunity after opportunity to the Defendants to defend themselves there, is set out in detail in the Judgment, which is attached as Exhibit C to the Lazore Declaration.

**B.    The Defendants had an opportunity to litigate in the Tribal Court the issues raised in the Motion.**

The Defendants elected not to raise in the Tribal Court this June or July the objections they later raised in the Motion.  They were obligated to do so or lose those possible defenses.

The Defendants can make no good-faith argument concerning the current authority of the Tribal Court.  The Defendants had a full opportunity in these recent proceedings to raise the defenses asserted now before this Court.

There was publication notice of the hearing on approval of the Assignment, which the Defendants undoubtedly tracked.  And in the motion for interest, regarding which the Defendants were personally served, all of the issues in the Motion now at bar were actually decided.

It was necessary for the Tribal Court to consider the Trustees' standing and validity of the Judgment in order to award $1 billion in interest to the Trustees.  Any truly-embraced allegation that the Assignment was invalid or that the Judgment was settled could and should have been raised in opposition to a motion seeking an award of $1 billion of interest to persons the Defendants now claim lack standing.

That motion for interest was heard on July 9, 2007, and the Interest Order was issued July 12, 2007, in the same Tribal Court in which the Defendants previously appeared through counsel and were served with notice of all proceedings.  Vacco Decl. ¶¶ 34, 35 and Ex. B thereto.  The time for Defendants to appeal the Interest Order lapsed on July 23, 2007.  Vacco Decl. ¶ 36.  *See also* White Decl. ¶ 8 and Ex. B at 13 thereto.

As a result, the Interest Order is now final, and the Defendants are precluded from relitigating here the defenses that should have been raised in the Tribal Court.  By failing to

appear in the Tribal Court and to file a timely appeal, the Defendants exhausted their Tribal Court remedies.

Federal courts apply a four-prong test for determining the preclusive effect of an order of another court. *Alfadda v. Fenn*, 966 F. Supp. 1317, 1329-1330 (S.D.N.Y. 1997) *aff'd*, 159 F.3d 41 (2d Cir. 1998). For issue preclusion to apply: 1) the issues of both proceedings must be identical; 2) the relevant issues must have been actually litigated and decided in the prior proceeding; 3) there must have been full and fair opportunity for the litigation of the issues in the prior proceeding; and 4) the issues must have been necessary to support a valid and final judgment on the merits. *See Leather v. Eyck*, 180 F.3d 420, 425 (2d Cir. 1999), *remanded to*, 97 F.Supp.2d 482 (S.D.N.Y. 2000). The policy of issue preclusion has the dual purpose to end litigation, once a party has had a fair opportunity to litigate the issue, and to promote judicial economy. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). This test is easily met here.

**C.     The Tribal Court system is the exclusive arbiter of these issues.**

In addition to common principles of issue preclusion, the law governing the relationship of the federal and tribal courts mandates this result. The Supreme Court and the Second Circuit have repeatedly recognized the federal government's longstanding policy of encouraging tribal self government, without interference by the federal courts. *See Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14 (1987); *see also Basil Cook Enters., Inc. v. St. Regis Mohawk Tribe*, 117 F.3d 61, 65 (2d Cir. 1997).

The Trustees have invoked this Court's jurisdiction for assistance in enforcing the Judgment. But that does not put before this Court any issue of Mohawk Law, or any fact that has been resolved by the Tribal Court. The Second Circuit has reasoned that for a federal court to rule even on the validity of this very Tribal Court

> [w]ould require this court to construe tribal law. This we may not do. The Supreme Court has long recognized the exclusive responsibility of Native American tribes to construe their own law, *see Talton v. Mayes*, 163 U.S. 376, 385 . . . ; *see also Runs After v. United States*, 766 F.2d 347, 352 (8th Cir. 1985); *Williams Co. v.*

OHS West:260297109.5

> *Fort Belknap Hous. Auth.,* 719 F.2d 979, 983 (9th Cir. 1983), and
> with that responsibility comes the parallel responsibility of federal
> courts to abide by those constructions, *see Hinshaw v. Mahler,* 42
> F.3d 1178, 1180 (9th Cir. 1994). Federal courts, as a general
> matter, lack competence to decide matters of tribal law and for us
> to do so offends notions of comity underscored in *National
> Farmers...* **As long as a tribal forum is arguably in existence,
> as a general matter, we are bound by *National Farmers* to defer
> to it.**

*Basil Cook,* 117 F.3d at 65-66; *see also Bowen v. Doyle,* 230 F.3d 525, 529 (2nd Cir. 2000).

The Defendants, in addition to having been obligated to raise in the Tribal Court in 2000

and 2001 any challenges they had to the Tribal Court's authority, and to appeal any adverse

ruling through the Tribe's court system, were also obligated *this year* to raise any objections to

the award of interest on an allegedly satisfied Judgment, to assignees under an Assignment.

They did not, and the issues have been resolved in the Tribal Court. The federal courts may not

review that decision.

**D.    To any extent this Court concludes that either of the issues raised in the
Motion remains unresolved, this Court should abstain and certify the issue to
the Tribal Court for resolution under Mohawk law.**

Mohawk Law is, of course, the applicable law governing the Tribal Court Action. On

March 8, 2001, the Tribal Court determined that the New York procedures regarding the

maintenance of a class action could be applied, but emphasized that "St. Regis Mohawk Tribal

law will govern all other issues." Lazore Decl. Ex. A at 5 thereto. In discussing the standard for

granting a default judgment, the standard for the accrual of actual damages, the standard for

granting punitive damages, and whether attorneys' fees and costs were appropriate, the Tribal

Court applied Mohawk Law in the Tribal Court Action. For example, the Tribal Court

specifically stated that "Federal law concerning default judgments is not binding upon this Court.

It is merely persuasive authority." Lazore Decl. Ex. A footnote 2 at pg. 5 thereto.

This Court has, of course, jurisdiction to grant judgment for (or against) the Trustees on

their Complaint herein. But, as discussed above, federal courts are required to grant special

*deference* to tribal courts in matters involving the interpretation of tribal law. "Adjudication of

such matters by any non-tribal court infringes upon tribal lawmaking authority, because tribal

courts are best qualified to interpret and apply tribal law." *Iowa Mutual Ins. Co.*, 480 U.S. at 16; *see also Basil Cook Enterprises,* 117 F.3d at 66.

Federal courts at times send certified questions concerning State law to the State courts, to determine those issues. *See Morris v. Schroder Capital Mgmt. Int'l.*, 445 F.3d 525 (2d Cir. 2006). For example, the Second Circuit uses this procedure in cases where there is a split of authority on the issues, where a statute's plain language does not indicate the answer, or when the court is presented with a complex question of State common law for which no State authority can be found. *See DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005), *cert. denied*, 546 U.S. 939 (2005); *see also* 2D CIR. R. §0.27 (2007).

The Court should deny the Motion, based on the factual baselessness of the Motion and the finality of the Judgment and the Interest Order issued by the Tribal Court, which preclude the Defendants from relitigating the issues previously determined by the Tribal Court in the Tribal Court Action – *in which they personally appeared.* But, to any extent this Court may find there are unresolved issues of Mohawk Law, as the Defendants have failed to cite to *any* Mohawk Law precedent, the certification and referral of Mohawk Law questions to the Tribal Court would be warranted. If this Court finds that there is an unresolved issue of Mohawk Law that is *material* to disposition of the Motion, it is respectfully submitted that this Court must refer those questions to the Tribal Court.

## IV.    THE MOTION IS A PREMATURE AND DEFECTIVE MOTION FOR SUMMARY JUDGMENT.

In its Notice of Motion, the Defendants assert that the Motion is brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure. That rule is invoked to test whether a complaint alleges facts sufficient to constitute a claim.

But in the Defendants' Memo, neither Rule 12(b)(6) nor any other rule of civil procedure is ever cited or discussed.[8] In fact, the Defendants do not attempt to test the adequacy of the

---

[8] In the Table of Authorities, the only "citation" to "Federal Rules" is *Williston on Contracts*.

Complaint. This is a judgment enforcement action, and the Defendants point to no fact that needs to be pled in such an action, but is missing from the Complaint. There is nothing missing.

The Motion is actually a summary judgment motion. And, as the Motion relies heavily on sworn testimony of the Defendants' counsel, it *must* be treated as one. The conversion of a Rule 12(b)(6) motion into one for summary judgment is *strictly* enforced and *mandatory*. As recently stated by the Second Circuit,

> Our enforcement of Rule 12(b)'s conversion requirement reflects not an arbitrary preference for procedural niceties, but rather a recognition of and commitment to the distinct policies that undergird Rule 12(b)(6) and Rule 56, two of the most potent and prolific pretrial tools in the Federal Rules. The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding the substantive merits. The Rule thus assesses the legal feasibility of the complaint, but does not weight the evidence that might be offered to support it.

*Global Network Comm'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006), *remanded to* 2007 WL 2471813 (S.D.N.Y. 2007).

On the other hand, the streamlined testing of the *substantive* merits of an action is reserved for the summary judgment procedure, governed by Federal Rule of Civil Procedure 56, where both parties may conduct appropriate discovery and submit the additional supporting material contemplated by that rule. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) *remanded to* 2003 WL 749422 (S.D.N.Y. 2003). Summary judgment is the proper procedural device to consider matters outside the pleadings, such as facts unearthed in discovery, affidavits and other relevant forms of evidence. *Global Network*, 458 F.3d at 155.

Additionally, the Motion flatly fails to meet the requirements of the Local Rules of this Court concerning motions for summary judgment. It does not include a "Statement of Material Facts," as it *must* under Local Rule 7.1(a)(3), to which the Trustees would then respond, to focus for the Court the parties' contentions concerning material disputed issues. Facts that the movant contends are not subject to a genuine dispute *require* citation to the case record, which cannot

OHS West:260297109.5

include "attorney's affidavits." **Failure to conform to this rule mandates denial of the Motion.** L.R. 7.1(a)(3).

As *this* Court has noted, the Local Rule's requirement of a separate statement of material facts is not a suggestion, nor is it a rule of general guidance upon which attorneys are free to impose their own interpretations of what must be submitted. Rather, in requiring full and strict compliance, the rule causes the movant to focus sharply on the specific factual issues in dispute. *Riley v. Town of Bethlehem,* 5 F.Supp.2d 92, 93-94 (N.D.N.Y. 1998).

As reflected in the Vacco Report, which is attached to Tribal Council Resolution #2007-41 (Exhibit A to White Decl.), during the pendency of the Prior District Court Actions the Defendants and their counsel conspired to mislead this Court, while secretly manipulating the executive and legislative authorities of the Tribe. Those actions by the Defendants caused some members of the Class to want to seek a settlement. But, even if there were a settlement, the efficacy of it would now need to be viewed in the full light of the recently uncovered evidence. That evidence, set out in detail in the Vacco Report, was discovered as the result of the termination by the Tribe of a previous agreement with Harrah's.

The Motion should be denied. The Trustees respectfully request that any such a denial not, however, allow the Defendants to further postpone their answer to the Complaint. When the Defendants requested an extension of the time to respond to the Complaint, counsel for the Defendants represented to this Court they needed the extension "to respond in a substantive way to this complaint." In fact, the Defendants have used this extended time to avoid a substantive response and to consume the resources of the Trust and this Court in the consideration of an improper motion, while Harrah's pushes its LBO to a closing, potentially impairing the enforcement of the Judgment.

## CONCLUSION

The Motion does not even raise a ground for dismissing the Complaint for failure to state a claim against the Defendants. The Motion raises champerty with regard to the Assignment of the Judgment, which has been approved by the Tribal Court. The Motion raises a settlement that

-24-

the Defendants admit is incomplete and unimplemented.  And the Defendants do not even describe how the incomplete settlement could be viewed as having satisfied the Judgment.  Each of these alleged grounds for judgment now in favor of the Defendants is factually baseless and legally unsound.

Moreover, any concern about these two issues could have and, therefore, must have been addressed to the Tribal Court, when the Defendants had the recent opportunity and obligation to do so.  As the Defendants have deliberately refused to defend themselves in the Tribal Court, they must now bear the consequences of their disrespect.  The Tribal Court has ruled that the Assignment is valid and that the Judgment has not been satisfied.  Those issues cannot be relitigated by the Defendants in this action.

The Motion should be denied, and the Defendants should be ordered to answer the Complaint forthwith.

Dated: New York, New York
       September 11, 2007

Respectfully submitted,

By:   */s/ Frederick D. Holden, Jr.*

Frederick D. Holden, Jr. (admitted *pro hac vice*)
Michael T. Stolper
Rachel Patience Ragni (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, NY  10103-0001
(212) 506-5000
Attorneys for Plaintiffs

OHS West:260297109.5