**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DENNIS C. VACCO and JOSEPH E. BERNSTEIN,**
**individually in their capacities as Litigation**
**Trustees of the CATSKILL LITIGATION TRUST,**

                              **Plaintiffs,**

**-against-**                                              **07-CV-663**


**HARRAH'S OPERATING COMPANY, INC., and**
**CLIVE CUMMIS,**

                              **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                         **DECISION & ORDER**

**I.      INTRODUCTION**

        Plaintiffs commenced this action "to enforce a money-judgment (the 'Judgment') for

$1,787,000,000, plus interest and costs, issued by a Native American tribal court against

non-Native Americans."  Compl. ¶ 6.  The Judgment was issued on default in the Tribal

Court of the Saint Regis Mohawk Tribe on March 20, 2001.  Id. ¶¶ 11-22.  Two prior

actions commenced in this Court concerned the same judgment.  The first, Park Place

Entertainment Corp., et al. v. Arquette, et al., 00-CV-0863 ("Arquette I" or "the Injunction

Action"), sought, inter alia, to enjoin the Tribal Court action in which the Judgment was

issued. See Compl. ¶ 8(a); see also Compl. in Arquette I.  The second, Arquette et al. v.

                              1

Park Place Entertainment Corp. & Cummis, 01-CV-1058 ("Arquette II" or "the First Enforcement Action"), sought to enforce the Judgment. See Compl. ¶ 8(a); see also Compl. in Arquette II.   Both prior actions were dismissed without prejudice based upon reported settlements. See Compl. ¶ 8(a); see also 3/31/03 "Judgment Dismissing Action Based Upon Settlement" in Arquette I  [dkt. # 50 ]; 3/31/03 "Judgment Dismissing Action Based Upon Settlement" in Arquette II  [dkt. # 56].

The current action seeks, "in effect, [to] reinstate[]" Arquette II to enforce the March 20, 2001 Judgment issued in the Tribal Court. Compl. ¶ 8(a).  Defendants moved to dismiss the action pursuant Fed. R. Civ. P. 12(b)(6) on the grounds that: (a) the named Plaintiffs are improper parties because they obtained their interest in the Judgment pursuant to an assignment prohibited by New York Judiciary Law § 489(1); and (b) the issue raised in this action was previously settled. See generally, Def. Mem. L. [dkt. # 16-2]. Plaintiffs opposed the motion.  See generally Plt. Mem. L. [dkt. # 17-1].   The Court denied the motion with leave to renew as a Rule 56 motion because the parties relied on factual materials beyond the pleadings. See 10/29/08 Dec. & Ord., dkt. # 42.

After a period of limited discovery, Defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56 seeking to dismiss the action for several reasons, including that the issue raised in this action was previously settled. See Def. Mot., dkt. #  45, # 48. Plaintiffs opposed the motion, dkt. # 49 - # 55, and Defendants filed a reply.  See Reply dkt. # 58. The motion is now before the Court on the papers submitted.

## II.    STANDARD OF REVIEW

The standard to review a motion for summary judgment is well settled, adequately

2

set forth by the parties in their memoranda of law, and need not be repeated here.  The

Court will apply this standard to the pending motion.

### III.    BACKGROUND

       This case arises in the midst of a long-standing dispute within the St. Regis

Mohawk Tribe ("the Tribe") regarding the system of governance in the Tribe, and the

uncertainty by the Executive Branch of the U.S. government as to which system of tribal

government it would recognize for purposes of interaction with the U.S. government.  See

United States v. Sandoval, 231 U.S. 28, 46-47, 34 S. Ct. 1, 5-6 (1913)(tribal status for

purposes of recognition by the U.S. government is determined by Congress, not the

courts); United States v. Holliday, 70 U.S. 407, 419 (1865) (if "the executive and other

political departments" recognize an Indian tribe "this court must do the same"); Iron Crow

v. Ogallala Sioux Tribe of the Pine Ridge Reservation, 129 F. Supp. 15, 19 (D.S.D. 1955)

(Congress has delegated to the Bureau of Indian Affairs and the Secretary of the Interior

the authority to recognize tribal courts), aff'd 231 F.2d 89 (8th Cir. 1956); see also Ransom

v. Babbitt, 69 F. Supp. 2d 141 (D.D.C. 1999) ("In situations of federal-tribal government

interaction where the federal government must decide what tribal entity to recognize as the

government, it must do so in harmony with the principles of tribal self-determination.").

The historical background relevant to U.S. government recognition of Tribal authority is

provided only to give historical context to the circumstances existing at the time that the

central and determinative issue on this motion occurred.

       The history of the internal conflicts relating to the government of the

Tribe up to 1999 is set forth in detail in the Ransom decision. Id. at 143-47.  In summary,

"[f]rom 1802 until 1995 . . .  the Tribe operated under a Three Chief System of government

whereby three Chiefs, elected by Mohawk voters, together acted as the Tribe's governing body for staggered, three-year terms." Id. at 143.  The BIA recognized the Three Chief System of government as the legitimate government of the St. Regis Mohawk Tribe during this period.

In June of 1995, the Tribe held a referendum on a proposed new tribal constitution which would have replaced the Three Chiefs system with a government consisting of three branches, including a tribal court. Id.  By its own terms, the proposed constitution required a 51% vote of the Tribe to be validly adopted. Id. The constitution narrowly failed to receive the requisite 51% vote in the June 1995 referendum. Id.  Notwithstanding the failure of the constitution to be validly adopted, the Mohawk Tribal Clerk certified that the constitution had in fact been adopted and the then-existing Chiefs began to operate as the Tribal Legislative Council under the new constitution. Id.

The failure of the proposed constitution to receive 51% of the vote created internal conflict within the Tribe, leading to a second referendum on June 5, 1996, in which the Tribe was asked to vote on the validity of the constitution. By a vote of 651 to 339, the Tribe rejected the constitution's validity. Id. at 144.  In subsequent referenda in 1996, the Tribe voted for the election of a new slate of chiefs and, by a vote of 394 to 17, voted that the Tribal Court was without authority. Id. at 144-46.

Despite the failure of the constitution to be validly adopted and the subsequent referenda in which the Tribe disclaimed that the proposed constitution had any effect, the BIA initially recognized the constitutional government as the legitimate government of the St. Regis Mohawk Tribe. Id. at 144-45. The newly-elected Three Chiefs brought an action in federal court in the District of Columbia (the Ransom v.

4

Babbitt case) seeking judicial review of the BIA's decision.  In May 1999, the Three Chiefs

government passed a resolution rescinding the Tribe's Judiciary Act of 1994 (which had

established the Tribal Court) thereby abolishing the Tribal Court.  The group within the

Tribe opposed to the Three Chiefs system of government asserted that, at the time this

resolution was passed, the Three Chiefs system of government was not recognized by the

Tribe or the DOI as the government of the Tribe.  Thus, this group contended that the

Three Chiefs lacked authority to rescind the Judiciary Act of 1994, and the Tribal Court

continued to operate.

The District Court of the District of Columbia ruled on September 30, 1999 in

Ransom that the BIA had acted arbitrarily and capriciously in refusing to recognize the

Three Chiefs government. Id. at 155. The BIA took an appeal from that decision.

However, the BIA advised the Three Chiefs on February 4, 2000 that, pending

appeal of the Ransom decision, the BIA would recognize the Three Chiefs system of

government. See Carpinello Decl. Ex. I. The BIA field representative's decision to

recognize the Three Chiefs was appealed by the proponents of the constitutional

government, and, on April 24, 2000, their appeal was rejected by the Director of the

Eastern Region of the BIA. See Carpinello Decl. Ex. J. That decision, in turn, was

appealed to the Interior Board of Indian Appeals ("IBIA") which determined that any

appeal would be stayed pending the results of an upcoming election in June 2000. See

Carpinello Decl. Ex. K.  The sitting Three Chiefs were reelected in that election and moved

to dismiss the administrative appeal. That motion was granted on August 25, 2000. See

Carpinello Decl. Ex. L.

In April of 2000, an agreement was reached between the St. Regis Mohawk Tribal

5

Council and Park Place Entertainment Corporation (Park Place[1]) to develop an Indian gaming casino in cooperation with the Tribe in Monticello, New York.  Shortly after the agreement was reached, a faction of the Tribe opposed to the Three Chiefs system of government and the Tribal Council - the Arquette parties - filed a class action lawsuit in a tribal court established under the constitutional government (the "Tribal Court") against Park Place and its officers.  The action sought (a) to annul the Tribal Council's agreement with Park Place, and (b) billions of dollars in damages for the alleged tortious interference with the relationship between the Mohawk Tribe and another company (Monticello Raceway Development Co., L.L.C.) that purportedly had already entered into a contract with the Mohawk Tribe for the development of a casino in Monticello.

On June 2, 2000, Park Place and its officers commenced an action in this court against the named-plaintiffs in the Tribal Court action (the "Arquette Parties")[2] seeking (1) a declaration that the Tribal Court was without proper authority, and (2) an injunction barring the litigation in the Tribal Court.  See Park Place Entertainment Corp., et al. v. Arquette, et al., 00-CV-0863 (Arquette I ).  The Arquette Parties appeared in the federal court action through counsel, Michael Rhodes-Devey, Esq.  This Court determined that it lacked subject matter jurisdiction to entertain the matter and dismissed the action on September 16, 2000.  See Park Place Entertainment Corp., et al. v. Arquette, et al., 113 F.

---

[1]Park Place changed its name to Caesar's Entertainment, Inc., and merged with Harrah's on June 28, 2005. Carpinello Aug., 13, 2007 Decl. ¶ 2, dkt. # 16-2.

[2]The defendants in "Arquette I" were: Marlene Arquette, Ella Peters, Dick Peters, Benette White, Louis Gray, Roy Tarbell, David Lazore, Troy Lazore, Henry Gibson, Matt David, Randy Connors, Julius D. Herne, Patty Lazore Mancuso, Noel White, Carolyn Tarbell, Ellene Herne, Glenn Hill, Sr., Barbara Lazore, Phil Tarbell, Kerney Cole, Mary Dianee Lazore, Russell Lazore, Joanne King, Rena Smoke, Charlie Terrance, Irma White Moore, Lois Thomas, Carol Herne and Bryan Garrow.

Supp.2d 322 (N.D.N.Y. 2000).  The decision was appealed to the United States Court of Appeals for the Second Circuit.

On October 6, 2000, the BIA advised the Three Chiefs that it had withdrawn its appeal of the Ransom decision and had "recognized the Chiefs elected under the Tribe's traditional government.  Accordingly, the Department is now precluded from recognizing the former constitutional government, including the judicial system established under that constitution." See Carpinello Decl. Ex. M. The BIA further stated:

> As the recognized governmental authority at Akwesasne and in the absence of a governing document adopted by the people, the St. Regis Mohawk Tribal Council determines what authority, if any, its governmental units may exercise. Since you have determined that the "constitutional faction" and its court system are without any legislative authority, the Bureau of Indian Affairs shall disregard any issuance by that "court" of any summons, appearance notices, suits, etc.

Id. at ¶ 3 .

On March 20, 2001, a default judgment in the amount of  $1,787,000,000, plus interest and costs, was issued against Park Place and its officers in the Tribal Court.   On June 27, 2001, the Arquette Parties commenced Arquette II (Arquette et al. v. Park Place Entertainment Corp. & Cummis, 01-CV-1058) in this Court seeking to enforce the Tribal Court Judgment against Park Place and one of its officers, Clive Cummis.  The Arquette Parties were represented in Arquette II by attorney Henry M. Greenberg, Esq.

On March 29, 2001, Park Place and Cummis commenced an action in New York State Supreme Court against most of the Arquette parties and their attorney, Michael Rhodes-Devey, alleging claims for defamation and prima facie tort arising from the Tribal Court action.  Although commenced in New York County, the case was transferred to Franklin County, New York and has been referred to by the parties as "the Franklin County

7

Action."

Sometime between March 20, 2001 and May 14, 2001, the "Catskill Group" (consisting of groups of casino developers, including Monticello Raceway Development Co., L.L.C., in favor of the development and management by Monticello Raceway Development Co., L.L.C. of a casino at the Monticello Raceway in Sullivan County, New York), brought an action in the Southern District of New York against Park Place claiming tortious interference with contractual relations, interference with prospective business relationships, and violations of the Donnelly Act.  See Catskill Dev., L.L.C. v. Park Place Entm't Corp., 144 F. Supp.2d 215 (S.D.N.Y. 2001). The claims in that action, which included a tortious interference with contractual relations claim similar to that asserted in the Tribal Court, were eventually dismissed *en toto* after years of litigation. See Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115 (2d Cir. 2008).  Familiarity with the numerous decisions in the "Catskill Group litigation" is presumed.

On August 20, 2001, Defendants in Arquette II moved for summary judgment in this Court, contending, *inter alia*, that the Tribal Court did not exist under Tribal law and, therefore, the Judgment was a nullity and could not be enforced in federal court.[3] Plaintiffs cross-moved for summary judgment in the same action on October 30, 2001.[4] The motions were scheduled to be decided, based upon the written submissions alone, at

_____

[3] See Def. Mot. S. J. in Arquette *et al.* v. Park Place Entertainment Corp. & Cummis, 01-CV-1058 [dkt. # 11].

[4] See Plt. Cross-Mot. S. J. in Arquette *et al.* v. Park Place Entertainment Corp. & Cummis, 01-CV-1058 [dkt. # 15].

the Court's January 14, 2002 motion calendar.[5]

On January 12, 2002, the Second Circuit Court of Appeals issued a Summary

Order on the appeal in Arquette I (Park Place Entertainment Corp., et al. v. Arquette, et

al.), ordering that Arquette I

> be remanded to the district court for further development of the record with
> regard to the letter of Michael J. Anderson, Deputy Assistant Secretary of the
> United States Department of the Interior ("DOI"), to Chiefs Ransom, Smoke
> and Thompson of the Saint Regis Mohawk Tribal Council, dated October 6,
> 2000 (indicating that the DOI is precluded from recognizing the constitutional
> government and constitutional court of the St. Regis Mohawk Tribe), the
> impact of this letter, if any, on the [ ] disposition of the case, and the DOI's
> current position with regard to the legitimacy of the constitutional government
> and constitutional court.

Summary Order,  Park Place Entertainment Corp., et al. v. Arquette, et al., 00-9365 (2d

Cir. 2001).[6]

On remand and after several conferences with United States Magistrate Judge

David Peebles to develop the record as mandated by the Second Circuit's Summary

Order, the Court issued an order on July 29, 2002 that provided as follows:

> The parties have now had numerous conferences with Judge Peebles and
> together have explored the current position of the DOI on the governing
> structure of the St. Regis Mohawk Tribe.  It now appears that the DOI
> recognizes the Three Chiefs system of government for the Tribe, and that a
> Tribal Council Resolution invalidated the Tribal Court system.  Further, the
> Court notes that it appears a referendum vote was held by the Tribe in which
> the Tribe voted the Tribal Court was without authority.  See Ransom v.
> Babbit, 69 F. Supp.2d 141, 153 (D. D.C. 1999)(the vote against the Court
> was 394 of the 411 cast).
>
> In light of these new developments, the Court must determine how to

---

[5]See dkt. entries # 30 & # 35 in Arquette et al. v. Park Place Entertainment Corp. & Cummis, 01-CV-
1058.

[6]The Summary Order is contained at dkt. # 24 in Park Place Entertainment Corp., et al. v. Arquette,
et al., 00-CV-0863.

proceed.  The Court is aware that the parties disagree substantially on the future course of this action.  Defendants request that the action be transferred directly to the Second Circuit.  The Plaintiffs contend the matter should remain before the district court.  The Court finds that in order to make such a determination, further briefing is necessary.  Consequently, the parties shall have 45 days from the date of this Order to brief the following issues:

(1) What remedies, if any, are available at the tribal level; and

(2) Does this Court have subject matter jurisdiction over this action?

(3) If this Court has subject matter jurisdiction over this action, should the case proceed in this Court or should it be transferred to the Second Circuit?

7/29/02 Decision & Order in the Injunction Action.[7]

In September 2002, the attorneys for the parties began discussing between themselves a settlement of the pending actions. See Carpinello Decl. ¶ 43.  After the parties submitted their supplemental briefing as ordered by the Court, the parties, through their attorneys, engaged in several conferences with Magistrate Judge Peebles for the purpose of attempting to settle *both* Arquette I (the Injunction Action) and Arquette II (the First Enforcement Action). See dkt. entries # 43 (minute entry of 10/22/02 settlement conference); # 45 (minute entry of 2/13/03 settlement conference); # 47 (minute entry of 3/18/03 settlement conference) in Arquette I (the Injunction Action); dkt. entries # 50 (minute entry of 10/22/02 settlement conference); # 52 (minute entry of 2/13/03 settlement conference); # 54 (minute entry of 3/18/03 settlement conference) in Arquette II (the First Enforcement Action).  At the October 22, 2002 settlement conference, the attorneys advised Magistrate Judge Peebles that they were "close" to a settlement and requested

---

[7]The 7/29/02 Decision & Order is dkt. # 39 in Park Place Entertainment Corp., *et al.* v. Arquette, *et al.*, 00-CV-0863.

10

that the Court hold the pending motions in abeyance to allow the parties to finalize

settlement.  See Minute Entry (attached as Ex. Z to Carpinello Decl.). The Court agreed to

hold the motions in abeyance pending further settlement discussions with Magistrate

Judge Peebles. Id.

The minute entry for the February 13, 2003 telephone conference indicates that

"[d]rafts of settlement agreements have been exchanged & 4 weeks is needed to

complete final agreement. Parties report that there are a large number of signatories

involved, whereas some are now deceased & are looking to the estates for signatures."

02/13/2003 Minute Entry, dkt. # 52 in Arquette II.  On March 17, 2003, the parties

circulated a revised settlement agreement.  See Carpinello Decl. Ex. DD.   According to

Defendants' attorney George F. Carpinello, Esq., he and Plaintiffs' counsel Henry

Greenberg, Esq. had reached agreement on all the material terms of the settlement and

release, and the draft circulated on March 17, 2003 merely reflected language changes

requested by the parties on non-material terms of the agreement.  Carpinello Decl., ¶ ¶ 49

-50.  Of most significance are the provisions in the March 17, 2003 proposed settlement

agreement that were unchanged from prior drafts.  These provided (1) that  the "Tribal

Litigants" would "seek to vacate the Judgment . . . and discontinue all proceedings [in the

Tribal Action] . . . with prejudice; and (2) that "[w]ithin thirty (30) days after the entry of the

stipulation and order vacating the Judgement in the Tribal [] Action and discontinuance

thereof with prejudice . . .  the parties will enter into and file Stipulations of Discontinuance

with prejudice in [Arquette I,  Arquette II, and the Franklin County Action]."  Id.

On March 31, 2003, at an "In-Person Settlement Conference" held with Magistrate

Judge Peebles, the attorneys for the parties advised Magistrate Judge Peebles that they

11

had reached a settlement.  Attorney Carpinello, who participated in the conference, states

without contradiction that

> all counsel advised Judge Peebles that a settlement had been reached.
> Under the terms of the settlement, the parties agreed that (1) Arquette I,
> Arquette II and the Franklin County Action would be dismissed with
> prejudice; (2) the Arquette Parties would take all necessary steps to vacate
> the purported tribal default judgment; and (3) the parties would exchange
> mutual releases.

Carpinello Dec. ¶ 47.

The minute entry on the Court's docket from this conference reads in pertinent part

as follows:

> Minute entry: In-Person Settlement Conference held before Judge Peebles
> in Albany, NY. Atty. Jonathan Hoff appears via telephone. Parties have
> reached settlement after lengthy discussions in both this action & 7:00-cv-
> 863. Atty. Carpinello will make changes to settlement agreements as agreed
> to by all parties. All counsel will sign these settlement agreements when
> completed today.[8] [The Courtroom Deputy Clerk] to Judge McAvoy has been
> notified that a judgment dismissing these actions by reason of settlement
> can be filed today in each action if it meets Judge McAvoy's approval. APP:
> Michael Rhodes-Devey, Esq., Hank Greenberg, Esq., George Carpinello,
> Esq. & Jonathan Hoff, Esq. (via telephone).

Docket entry # 57 in Arquette II.[9]

That same day, March 31, 2003, the Court signed and entered identical orders in

the two cases (with the exception that each order bore the caption of its respective case)

entitled "Judgment Dismissing Action Based Upon Settlement."  See dkt. # 56 in Arquette

II (the First Enforcement Action); dkt. # 50 in Arquette I (the Injunction Action).  Each

---

[8]The reference that "all counsel" would sign the agreements apparently arose from a
misunderstanding by the Court.  See Carpinello Decl. ¶ 47, fn. 2.  According to Attorney Carpinello, "Prior to
the March 31, 2003 conference, all counsel had agreed that the form of the settlement documents was to be
a settlement agreement and release, to be signed by all the parties themselves."  Id.

[9]An identical minute entry (referencing Arquette II as the other case also settled) was entered at
docket entry 51 in Arquette I.

Judgment Dismissing Action Based Upon Settlement provided:

> The court having been advised by counsel that this action has been settled, and that it is therefore not necessary for it to remain on the court's active docket, it is therefore hereby
>
> ORDERED, that the action is dismissed, without prejudice. The court will retain complete jurisdiction to vacate this order and to reopen the action within three months from the date of this order upon cause shown that the settlement has not been completed and further litigation is necessary; and it is further
>
> ORDERED, that the clerk shall forthwith serve copies of this judgment upon the parties and/or their attorneys appearing in this action by first class mail.

Judgment Dismissing Action Based Upon Settlement, dkt. # 56 in Arquette II; dkt. # 50 in Arquette I.

On April 7, 2003, the parties circulated another revised settlement agreement that contained two (2) minor non-material language changes, see Carpinello Decl. Ex. EE, and, on April 11, 2003, circulated ten copies of a final settlement agreement. See Carpinello Decl. Ex. FF.  Neither of these documents materially altered the terms that had been set forth in the settlement agreement circulated on March 17, 2003.

On May 15, 2003, Attorney Henry M.  Greenberg, Esq. wrote to Magistrate Judge Peebles (and carbon copied to the attorneys in Arquette I and Arquette II, and to "all plaintiffs" in Arquette II) asserting that neither he nor his firm continued to represent the Arquette Parties in Arquette II but that each of the plaintiffs in Arquette II "continue[s] to be represented by Attorney Michael Rhodes-Devey - the attorney of record on their behalf in [Arquette I]." Carpenello Decl.  Ex.  GG.  Attorney Greenberg also advised that "settlement of [Arquette I and Arquette II] had not yet been completed." Id.

On June 30, 2003, counsel for the parties[10] wrote jointly to Magistrate Judge

Peebles seeking a 60-day extension of the period within which the parties could apply to

the Court to reopen the actions.  See Attachments to Request and Order, dkt. # 58 in

Arquette II.  In this regard, the request stated:

> As you will recall, the Settlement Agreement in this matter requires the
> signatures of over 30 individuals.  We have obtained, or are about to obtain,
> all the signatures but one.  The parties have agreed to effect the settlement
> despite this one party's refusal to sign.  Nonetheless, it is necessary for
> certain steps to take place before final settlement can occur. Specifically, the
> tribal litigants have agreed to vacate and discontinue a certain tribal class
> action.  Once this is completed, all the parties will execute stipulations of
> discontinuance and will exchange releases.

Id.; see also Carpinello Decl. Ex. OO (stipulation and release signed by all Arquette

Parties except one).

On July 21, 2003, the Court "So Ordered" the 60-day extension request, thereby

giving the parties until September 1, 2003 to re-open the matters if necessary.  Id.  The

Court heard nothing further of either Arquette I (the Injunction Action) or Arquette II (the

First Enforcement Action) until the present action was commenced on June 22, 2007.

The events occurring subsequent to September 1, 2003 are also relevant to the

instant motion. In February 2004, Magistrate Judge Peebles issued a decision in Tarbell v.

Department of Interior, et al., 7:02-CV-1072 (Dkt. #. 57, Order of February 11, 2004)

holding that the DOI had erred in recognizing the Three Chiefs government in response to

the Ransom decision and was obliged to undertake its own independent determination of

the appropriate government of the St. Regis Mohawk Tribe.  In his order, Judge Peebles

---

[10]Attorney Michael Rhodes-Devey, Esq.  wrote on behalf of the Arquette Parties in both Arquette I
and Arquette II.  See Carpinello Decl.  Ex.  JJ.

14

noted that the Tribal Court

> depends for its continued authority upon recognition of the Constitutional
> Government [by the BIA], inasmuch as enactments adopted by the Three
> Chiefs Government have since abrogated the Courts, and in any event the
> Three Chiefs Government has never appointed a duly authorized judge to
> act on behalf of the Courts.

Tarbell, Doc. No. 57 at 54.

In response to Judge Peebles's order, the BIA conducted a inquiry and on

October 31, 2007 made its determination that the Three Chiefs, rather than the

constitutional government, were the legitimate government of the St. Regis

Mohawk Tribe. See Carpinello Decl. Ex. N at 7.  Proponents of the constitutional

government have taken an appeal from this decision.

By 2007, the power within the Tribe shifted to the parties that had opposed the

Three Chiefs system and who had promoted the Catskill Group litigation.  On January 14,

2007, a previously formed litigation trust ("the Trust")[11] entered into an agreement, called

the Joint Alliance Agreement, with the Arquette parties and the Tribe. Under the Joint

Alliance Agreement, the Arquette parties and the Tribe agreed to assign to the Trust their

interest in the Tribal Court default judgment, as well as any other asserted or unasserted

claims against Defendants, in return for a 50% interest in the Trust.

Between January 3, 2007 and May 23, 2007, the Mohawk Tribal Council passed a

series of resolutions that (1) converted the Mohawk Tribal Court into a court of plenary

---

[11]On January 12, 2004, the group of casino developers who brought the lawsuit against Park Place in
the Southern District of New York created a litigation trust (the "Trust") to pursue their claims asserted against
Park Place and Cummis in the Catskill Group litigation, see  Catskill Dev., L.L.C., 547 F.3d at 199, n. 1, and
in the Tribal Court.

original jurisdiction;[12] (2) "recognize[d]" the status of the Tribal Court "as an independent decision-making entity with independent judicial powers"; (3) appointed an "interim Chief Judge"; (4) declared "null and void *ab initio*" a 1999 resolution that had abolished the Tribal Court; (5) validated the Tribal Court's March 20, 2001 default Judgment against Defendants; (6) amended the Mohawk Rules of Civil Procedure to extend the statute of limitations for actions to collect a judgment to 10 years; and (7) adopted a new Code of Civil Procedure for the Tribe. Carpinello Decl. Exhs VV, XX, ZZ, AAA and BBB.  These resolutions, with the exception of Tribal Council Resolution 2007-01 (Carpinello Decl. Ex. VV), were drafted by  Dennis C. Vacco, one of the Plaintiffs herein, who was then acting as counsel for the Tribal Council.

On June 6, 2007, two weeks after his appointment, the interim Chief Judge of the Tribal Court issued an order preliminarily approving the assignment of the Arquette Parties and the Tribe's interests in the Tribal Court Judgment to the Trust as contemplated by the Joint Alliance Agreement.  Carpinello Decl. Ex. FFF.  On June 21, 2007, the Tribal Court issued an order finally approving this assignment.  That same day, the Arquette Parties, the Tribe and the Trust entered into a separate assignment agreement assigning the Arquette parties and the Tribe's claims to the Trust. Carpinello Decl. Exh. GGG.  The instant action was filed on June 22, 2007.  As indicated above, this action seeks to enforce the Judgment against Park Place's successor in interest, Harrah's Operating Company, Inc, and Clive Cummis, a former officer of Park Place.  Compl. ¶¶ 4-5.  The action is brought under the Court's federal question and diversity subject matter

---

[12]A reading of Tribal Council Resolution 2007-01 (Carpinello Decl. Ex. VV) appears to indicate that Tribal Court, at the time, merely handled traffic matters.

jurisdictional grants.  Id. ¶¶ 6-7.

**IV.    DISCUSSION**

      **a.**    **Prior Settlement**

      The Court will first address the argument that the subject matter of this case (i.e.

that there existed a valid and enforceable judgment from a foreign court of competent

jurisdiction) is the subject of a binding oral settlement agreement.  There is no dispute that

the subject matter of this case is the same as that in Arquette II.  Thus, if Arquette II had

been settled by prior agreement, then the Court must enforce the settlement and dismiss

the instant action regardless of whether, subsequent to settlement, an effort was made to

re-write history such to relieve any infirmity in the underlying claim.  See Powell v.

Omnicom, 497 F. 3d 124, 128 (2d Cir. 2007)("When a party makes a deliberate, strategic

choice to settle, a court cannot relieve him of that a choice simply because his

assessment of the consequences was incorrect.")(citing United States v. Bank of N.Y., 14

F. 3d 756, 759 (2d Cir. 1994)).  Indeed,

> [i]t is not only in this Court's power to enforce "summarily, on motion, a
> settlement agreement reached in a case that was pending before it," but it is
> this Court's *duty* to "enforce a settlement agreement which it ha[s] approved.
> . . ." Meetings & Expositions, Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir.
> 1974) (emphasis added). See also Haitian Ctrs. Council, Inc. v. Sale, 817 F.
> Supp. 336, 337 (E.D.N.Y.1993)("A district court may exercise its inherent
> power to protect the parties appearing before it, to preserve the integrity of
> an action, to maintain its ability to render a final judgment and to ensure the
> administration of justice.").

Walker v. City of New York, 2006 WL 1662702, at * 6 (E.D.N.Y. June 15, 2006).

      "A settlement agreement is a contract that is interpreted according to general

principles of contract law." Powell, 497 F.3d at 128. (citing Omega Eng'g, Inc. v. Omega,

S.A._, 432 F.3d 437, 443 (2d Cir. 2005)).  "Once entered into, the contract is binding and

conclusive." Id. (citing Janneh v. GAF Corp._, 887 F. 2d 432, 436 (2d Cir. 1989), abrogated

on other grounds by Digital Equip. Corp. v. Desktop Direct, Inc._, 511 U.S. 863, 114 S. Ct.

1992, 128 L. Ed.2d 842 (1994)).

> Parties may enter into a binding contract orally, and the intention to commit
> an agreement to writing, standing alone, will not prevent contract formation.
> Winston v. Mediafare Entm't Corp._, 777 F. 2d 78, 80 (2d Cir. 1985) (applying
> New York law).  Consequently, a "voluntary, clear, explicit, and unqualified
> stipulation of dismissal entered into by the parties in court and on the record
> is enforceable even if the agreement is never reduced to writing, signed, or
> filed."  Role v. Eureka Lodge No. 434, I.A. of M & A.W. AFL-CIO, 402 F.3d
> 314, 318 (2d Cir 2005) (*per curiam*).  The settlement remains binding even if
> a party has a change of heart between the time he agreed to the settlement
> and the time those terms are reduced to writing.  Millgard Corp. v. White Oak
> Corp._, 224 F. Supp.2d 425, 432 (D. Conn. 2002).

Powell, 497 F.3d at 128-29;[13] see Massie v. Metropolitan Museum of Art,  --- F. Supp.2d

----, 2009 WL 2745593, at *5 (S.D.N.Y. Aug.  28, 2009);[14] see also Mone v. Park East

---

[13]The Second Circuit noted in Powell that it is immaterial whether the settlement of federal claims is governed by New York law or federal common law because "New York law and federal common law [are] materially indistinguishable." Powell, 497 F.3d at 129, n. 1 (citing Ciaramella v. Reader's Digest Ass'n, 131 F.3d 320 (2d Cir. 1997) and Monaghan v. SZS 33 Assocs., 73 F.3d 1276, 1283 n. 3 (2d Cir. 1996) ("[T]he federal rule regarding oral stipulations does not differ significantly from the New York rule.")).

[14]The Court in Massie noted:

The Second Circuit has left open the question of whether state or federal law controls the enforceability of oral settlement agreements, whether in federal-question or diversity cases. See, e.g., Monaghan v. SZS 33 Assocs., L.P., 73 F.3d 1276, 1283 n. 3 (2d Cir.1996), aff'd, 73 F.3d 1276 (2d Cir.1996) ("We assume, without deciding, that New York law provides the rule of decision for determining the validity of the oral settlement agreement."). Nonetheless, federal courts in the Second Circuit regularly apply New York law, observing that there is no meaningful substantive difference between federal and New York law with regard to enforceability. See, e.g., Ciamarella v. Readers' Digest Ass'n, Inc., 131 F.3d 320, 322 (2d Cir.1997) ( "[W]e find there is no material difference between the applicable state law or federal common law standard"); Monaghan, 73 F.3d at 1283 ("[T]he federal rule regarding oral stipulations does not differ significantly from the New York rule"); see also Willgerodt ex. rel. v. Hohri, 953 F. Supp. 557, 560 n. 1 (S.D.N.Y.1997).

2009 WL 2745593, at *5.

18

Sports Medicine and Rehabilitation, P.C., 2001 WL 1518263, at *3 (S.D.N.Y. Nov. 29, 2001) (enforcing an oral agreement of settlement even though the parties expressly agreed that the oral agreement would be followed by a formal stipulation).

Here, as demonstrated by the numerous settlement conferences conducted by Magistrate Judge Peebles with the attorneys in Arquette I and Arquette II, the attorneys appeared at the March 31, 2003 settlement conference with apparent authority to settle both matters.  See Alvarez v. City of New York, 146 F. Supp. 2d 327, 334-35 (S.D.N.Y. 2001)("Although the decision to settle a case rests with the client, courts will presume that an attorney who enters into a settlement agreement has the authority to do so. . .. Courts in this Circuit have consistently recognized that an attorney may bind his client to a settlement agreement so long as the attorney has apparent authority."); see also Fennell v. TLB Kent Co., 865 F.2d 498, 502 (2d Cir.1989) ("if an attorney has apparent authority to settle a case, and the opposing counsel has no reason to doubt that authority, the settlement will be upheld"); Hallock v. State of New York, 64 N.Y.2d 224, 230-32 (1984)(an attorney has apparent authority to settle on behalf of a client, even if not vested with actual authority, where the attorney had "represented plaintiff through the litigation, engaged in prior settlement negotiations for [him] and, in furtherance of the authority which had been vested in him, appeared at the final pretrial conference, his presence there constituting an implied representation, by [plaintiff] to defendants that [the attorney] had authority to bind him to the settlement."); Hawkins v. City of New York, 40 A.D.3d 327, 327, 833 N.Y.S.2d 894, 895 (1st Dep't  2007) (plaintiff's counsel had apparent authority to settle).   At the March 31, 2003 conference, counsel announced that a settlement had been reached by which the parties agreed: (1) that Arquette I, Arquette II and the Franklin County Action

19

would be dismissed with prejudice; (2) the Arquette Parties would take all necessary steps to vacate the Tribal Court default judgment; and (3) the parties would exchange mutual releases.  It was further agreed that judgments dismissing the federal actions by reason of settlement could be filed that day, and, in fact, such dismissal judgments were filed that day.  The settlement was entered on the Court's dockets in both Arquette I and Arquette II. The final settlement documents, including the Stipulation of Discontinuance of Arquette II with prejudice, were never finalized.

In Winston, "the Second Circuit created a four pronged test to determine whether parties, who orally agree to settle a matter but fail to fully execute documents to that end, intend to be bound by those oral representations." Walker, 2006 WL 1662702, at * 6 (citing Winston, 777 F. 2d at 80).  The four prongs are: (1) whether there has been an express reservation of the right not to be bound in the absence of a writing;  (2) whether there has been partial performance of the contract;  (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.  Powell, 497 F.3d at 129 (citing Winston, 777 F. 2d at 80).  "No single factor is decisive, but each provides significant guidance." Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 323 (2d Cir. 1997).

> The Winston test is not an after-the-fact professed, subjective intent, but rather the parties' objective intent as "manifested by their expressed words and deeds at the time." Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC, No. 04-Civ-1621, 2005 WL 1377853, at *6 (S.D.N.Y. June 9, 2005) (citing Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT & T Commc'n, Inc., No. 92-Civ-7862, 1994 WL 463014, at *3 (S.D.N.Y. Aug. 24, 1994) (internal quotations omitted)).  The court must carefully weigh the four factors, first, to ascertain whether the parties intended to be bound and, second, to ward off a party's attempt to rewrite the history of a case or manipulate the opposing party.  "[T]he Court must be careful to guard

against the possibility that parties will seek to manipulate settlements to gain
strategic advantage, settling and 'unsettling' litigation to suit their immediate
purposes." Media Group, Inc. v. HSN Direct Int'l, Ltd., 202 F.R.D. 110, 112
(S.D.N.Y.2001).

United States v. United States Currency in the Sum of Six Hundred Sixty Thousand, Two

Hundred Dollars ($660,200.00), More or Less, 423 F. Supp.2d 14, 26 (E.D.N.Y. 2006).

### 1.    Express Reservation Not to be Bound

The first prong under Winston is whether "either party communicate[d] an intent not

to be bound until [it] achieve[d] a fully executed document." Winston, 777 F.2d at 80.  The

communication must be an "express reservation of the right not to be bound in the

absence of a writing." Id.   "Although Winston is a balancing test, the first prong . . . is

perhaps one factor with the power to tip the scales slightly more than the other three."

Walker, 2006 WL 1662702, at * 7.

Here, there was no express reservation of an intent not to be bound until a fully

executed settlement agreement was executed.  As indicated by the March 31, 2003

docket sheet minute entry, the parties agreed through counsel to have the Court enter

Judgments of Dismissal in both Arquette I and Arquette II on the same day that the

settlement was announced. This clearly evinces an intent to be bound by the oral

agreement.  See United States v. $660,200, 423 F. Supp. at 28; Vari-O-Matic Mach. Corp.

v. New York Sewing Mach. Attachment Corp., 629 F. Supp. 257, 259 (S.D.N.Y. 1986)

("since both parties made representations to the court that agreement had been reached,

there can be no factual dispute that a settlement had been consummated").

Further, as expressed in the June 30, 2003 joint letter request from counsel seeking

an extension of the period in which to reopen the matter, the parties expressed an intent

21

and agreement to settle the matter *without* a fully executed settlement agreement.  See
June 30, 2003 letter ("The parties have agreed to effect the settlement despite this one
party's refusal to sign.").

Despite that the stipulation and release circulated by the attorneys contained a
merger clause providing that it would be the sole agreement between the parties and
would supersede prior representations, the clause does not constitute a reservation of
rights and does not mean that the parties lacked the intent to settle the actions on the
terms agreed to at the March 31, 2003 court conference. See Pretzel Time, Inc. v. Pretzel
Int'l, Inc., 2000 WL 1510077, at *3 (S.D.N.Y. Oct. 10, 2000)(the merger clause was simply
"boilerplate language" that "[did] not undermine the evidence that the settlement
defendants intended to be bound by the oral agreement.").  Further, there is nothing in the
un-executed written document that contravenes the oral agreement.  The first Winston
factor tips in favor of a finding that the parties reached a binding oral settlement
agreement on March 31, 2003.

### 2.    Partial Performance

The second Winston factor is "whether one party has partially performed, and that
performance has been accepted by the party disclaiming the existence of an agreement."
Ciaramella, 131 F. 3d at 325.  The purported settlement agreement arose in the context of
two cases that hinged on the legitimacy of the Tribal Court.  Both the then-pending
summary judgment motion in Arquette II (the First Enforcement Action), and the Court-
ordered supplemental briefing in Arquette I (the Injunction Action), addressed this issue.
The Court's July 29, 2002 Order for supplemental briefing in Arquette I noted that the

22

Department of the Interior's opinion, a Tribal Council resolution of St. Regis Mohawk Tribe, and a referendum vote of the St. Regis Mohawk Tribe were all adverse to the authority of the Tribal Court.  The purported settlement was reached before the Court ruled on the authority of the Tribal Court, and at a time and in a posture in both cases that a ruling on this issue was impending, if not imminent.

Thus, by accepting the settlement, allowing the actions to be dismissed, and not seeking to reopen the matters within the allocated time period in which to do so, the Arquettte Parties gained the benefit of avoiding a ruling on the legitimacy of the Tribal Court that may well have been adverse to their interests.  To the extent that the Arquette Parties allowed Arquette II to be dismissed and the action ostensibly ended, there has been partial performance in reliance on the settlement agreement.  See Mone, 2001 WL 1518263, at *3 ("As to the second factor, there was partial performance of the agreement in the sense that plaintiff gave up her right to the imminent firm trial date."); Alvarez, 146 F. Supp. 2d at  336 ("there also was partial performance of the agreement in the sense that both sides, relying on the apparent settlement, did not resume active litigation of the case");  see also Hallock, 64 N.Y.2d at  232;[15] Monaghan v. SZS 33 Assocs., L.P., 73 F.3d

_____

[15]In Hallock, the New York Court of Appeals wrote:

Plaintiffs insist that apparent authority is an equitable doctrine, having its origins in the principle of estoppel, and that defendants must establish detrimental reliance before the settlement stipulation can be enforced. The discontinuance of lengthy litigation on the day of trial, in reliance on the adversary's settlement stipulation -- even for defendants, who often may prefer that judgment be deferred -- coupled with plaintiffs' silence for more than two months thereafter, is itself a change of position, if such a showing is indeed even required before the doctrine of apparent authority may be invoked. We need not inquire whether there was any actual loss of witnesses or evidence, for we recognize that, after five years, halting the machinery of litigation when a trial scheduled to begin that day is marked off the calendar constitutes detriment. Additionally, in the words of the dissenting Justice at the Appellate Division, to set aside this settlement stipulation "invites destruction of the process of open-court settlements, for every such settlement would be liable to subsequent rescission

1276, 1283 (2d Cir. 1996)("[P]laintiff reasonably relied on the parties' oral agreement in permitting her trial date to pass and in foregoing her right to participate in the third-party trial."); Smith v. Lefrak Organization, Inc., 142 A.D.2d 725, 726, 531 N.Y.S.2d 305, 306 (2d Dep't 1988)(defendants estopped from challenging oral stipulation of settlement where plaintiff signed a general release and stipulation of discontinuance, sent these documents to the defendants' attorney to be held in escrow pending receipt of the settlement proceeds, and took other action in reliance upon receiving the settlement proceeds). The partial performance factor weighs in favor of a finding of a binding oral settlement agreement.

### 3.   Agreement to All Terms

The third Winston factor concerns whether there has been agreement to all of the *material* terms of the settlement agreement.  Powell, 497 F. 3d at 130.  In Powell, the Second Circuit noted:

> We have held that even "minor" or "technical" changes arising from negotiations over the written language of an agreement can weigh against a conclusion that the parties intended to be bound absent a formal writing. See Winston, 777 F.2d at 82-83.  Such changes are relevant, however, only if they show that there were points remaining to be negotiated such that the parties would not wish to be bound until they synthesized a writing "satisfactory to both sides in every respect."  See id.; see also R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 76 (2d Cir. 1984) ( "A . . . factor is whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to.").

Id.

----

by the simple expedient of a litigant's self-serving assertion, joined in by his attorney and previously uncommunicated to either the court or others involved in the settlement, that the litigant had limited his attorney's authority."

64 N.Y.2d at  232 (citations and footnotes omitted).

The evidence fails to indicate that were any unresolved *material* terms to the

settlement agreement, as opposed to issues that "are relevant to performance of the

settlement rather than assent to its terms." Id.  Indeed, the uncontradicted evidence

indicates that: (1) the attorneys had exchanged settlement documents that evidenced that

the material terms of the settlement, including "with prejudice" dismissals of the federal

actions, had been agreed to; (2) the parties represented to Magistrate Judge Peebles on

March 31, 2003 that the matters had been settled on the terms already agreed to by the

attorneys and as stated at the conference; (3) the attorneys agreed on March 31, 2003 to

the contemporaneous entry of judgments dismissing both actions; (4) in their June 30,

2003 letter to the Court, there is no mention of the need to negotiate any additional terms

of the settlement, but only to effectuate those terms; and (5) the attorneys indicated in the

June 30, 2003 letter to the Court that they deemed the cases settled despite being unable

to obtain the signatures of all the tribal court class action plaintiffs.  While Attorney

Greenberg indicated on May 15, 2003 that "settlement was not complete," the statement

alone does not contravene the uncontradicted evidence that the parties had reached full

agreement on all material terms of the settlement by March 31, 2003 and that, thereafter,

the unresolved issues related to "performance of the settlement rather than assent to its

terms." Powell, 497 F. 3d at 130.  By the same reasoning, there is no merit to Plaintiffs'

argument that all material terms of the settlement had not been resolved by March 31,

2003 because the Tribal Court's rules for settling class action had not been complied with.

Neither Arquette I nor  Arquette II were class actions, and the extent to which certain Tribal

Court rules needed to be complied with to effectuate the terms of the settlement is a

matter impacting "performance of the settlement rather than assent to its terms." Powell,

497 F. 3d at 130.

By failing to move to re-institute the federal court actions in the time allotted by this Court, Plaintiffs impliedly conceded to the terms of the oral settlement and the final dismissal of those actions as stated in Court and as set forth in the parties' settlement documents.  Accordingly, the Court finds that the third <u>Winston</u> factor favors a finding of a binding oral agreement.

### 4.   Whether the Agreement is the Type Normally Reduced to Writing

The fourth <u>Winston</u> factor is "whether the agreement  . . . was the type of contract . . . usually put in writing."  <u>Winston</u>, 777 F.2d at 83.  "To determine whether the agreement is one normally reduced to writing, we are guided initially by N.Y. C.P.L.R. § 2104, which governs whether a writing is required under New York law in these circumstances."  <u>Massie</u>, 2009 WL 2745593, at *9.  N.Y. C.P.L.R. § 2104 provides that "[a]n agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered." <u>See</u> <u>Powell</u>, 497 F. 3d at 129, n. 2 ("Under New York law, the requirement that the settlement be on the record and in open court serves as a limited exception to the Statute of Frauds.")(citing <u>Jacobs v. Jacobs</u>, 229 A.D. 2d 712, 645 N.Y.S.2d 342, 344-45 (1996)).

Although there was no contemporaneous record made of the March 31 proceedings, the oral agreement articulated that day constituted a "voluntary, clear, explicit, and unqualified" settlement in open court that was in substantial compliance with N.Y. C.P.L.R. § 2104. <u>See</u> <u>Monaghan v. SZS 33 Assoc., L.P.</u>, 73 F.3d at  1282-83

26

(upholding district court's enforcement of an oral settlement agreement, stating that "the parties were together in court . . . and, although a contemporaneous record was not made, they discussed a proposed settlement with the judge."  Even though the "parties' agreement did not meet the technical requirements of New York law for a binding settlement . . . . substantial compliance" with these requirements was "deemed sufficient."); Hawkins, 40 A.D.3d at 327, 833 N.Y.S.2d at 895 (CPLR 2104 satisfied "when, following the conference and counsel's acceptance of the settlement, the court clerk updated the court card to read 'settled before trial' and marked the case 'disposed' in the court's records."); Van Ness v. Rite-Aid of New York, Inc., 129 A.D.2d 931, 932,  514 N.Y.S.2d 570, 571 (3d Dep't 1987) (enforcing settlement where "terms of CPLR 2104 were substantially complied with" and holding that "defendant is estopped from taking refuge in a technicality that literal compliance was not had with CPLR 2104"); Popovic v. New York City Health & Hospitals Corp., 180 A.D.2d 493, 493,  579 N.Y.S.2d 399, 399-400 (1st Dept.1992) ("open court" requirement of CPLR 2104 satisfied and settlement agreement enforced where, in the presence of the court but unrecorded by court reporter, the parties agreed to settle the matter and the settlement was noted on the court record); Deal v. Meenan Oil Co., 153 A.D.2d 665, 665-66, 544 N.Y.S.2d 672, 673 (2d Dep't 1989) (the fact that settlement was recorded in the clerk's "minute book" satisfied the "open court" requirement of CPLR 2104); Pretzel Time, 2000 WL 1510077, at *5 (noting that the requirement that the settlement agreement be "in open court" is "more figurative than literal" and holding that the settlement agreement need not be in a courtroom or even before a judge so long as the settlement is undertaken with indicia or reliability similar to a statement made in open court).

27

Further, the circumstances following the March 31, 2003 conference support the conclusion that the attorneys announced the parties' true and complete agreement.  The Court entered judgments dismissing the actions on the same day as the settlement was announced.  All of the Arquette Parties except one signed the stipulation and release, see Carpinello Decl. Ex. OO, and there is a signed letter from their counsel stating that sufficient signatures had been obtained to enforce the settlement.  Carpinello Decl. Ex. JJ. The in-court announcement combined with the Court's docket entries, the entry of judgments dismissing the federal actions, and the nearly-complete signed stipulation and release "functioned in a manner akin to that of a memorializing writing." Powell, 497 F. 3d at 131.

Still further, as noted above, none of the Arquette Parties made any attempt to reopen the matter until the instant litigation was commenced some four years after the settlement was reached, causing Defendants to forego pursuing their summary judgment motion in Arquette II.  This acquiescence can be deemed ratification by the Arquette Parties of their attorneys' in-court settlement agreement.  See Hawkins v. City of New York, 40 A.D.3d 327, 327, 833 N.Y.S.2d 894, 895 (1st Dep't 2007)(plaintiff ratified counsel's settlement agreement by failing to make any formal objection for "nearly seven months after being told about it"); Clark v. Bristol-Myers Squibb & Co., 306 A.D.2d 82, 85, 761 N.Y.S.2d 640, 643 (1st Dep't 2003)(plaintiff "implicitly ratified settlement by making no formal objection for months after she was told about it"); Suncoast Capital Corp. v. Global Intellicom, Inc., 280 A.D.2d 281, 281-82, 719 N.Y.S.2d 652, 653 (1st Dep't 2001)(six months of silence constitutes implicit ratification of settlement agreement); Broadmass Assocs., LLC v. McDonalds Corp., 286 A.D.2d 409, 410, 729 N.Y.S.2d 897, 897 (2d Dep't

28

2001)(construing eight months of silence as an implicit ratification of stipulation); <u>see also</u> <u>Lefrak Organization, Inc.</u>, 531 N.Y.S.2d at 306  (defendants estopped from challenging oral stipulation of settlement that did not comply with CPLR 2104 where plaintiff relied to his detriment upon settlement). To this extent, "the fourth prong of <u>Winston</u> supports [the] conclusion that not only did the [plaintiffs] intend to *enter* into the oral settlement agreement at issue but also that all of the parties intended to be *bound* by their oral representations at the [March 31, 2003] settlement conference." <u>United States v.</u> <u>$660,200</u>, 423 F. Supp. at 31 (emphasis in original).

On the fourth <u>Winston</u> factor, courts also look to the complexity of the transaction to determine whether the agreement is the kind ordinarily memorialized by a written agreement.  Here, in contrast to other cases that involved complex settlements requiring long-term structured payments, <u>see</u> <u>Winston</u>, 777 F. 2d at 83; <u>Ciaramella</u>, 131 F.3d at 326, there was little complexity to the settlement agreement represented to the Court.  A principal effect of the agreement - immediate dismissal of the two federal court actions - involved no complexity and was completed the same day that the agreement was reported to the Court.  The subsequent letter request for an extension of time mentioned no complexity in the settlement terms - but only a difficulty in obtaining the signature of one plaintiff - and of that, counsel represented that the parties would deem the matter settled nonetheless.  However, because the settlement involved vacating a judgment arising from a Tribal Court class action suit, a valid argument can be made this was the type of agreement that ordinarily would require a writing.  Even though <u>Winston</u> "would be a strange test if the fourth factor always favored finding no agreement on the ground that settlement agreements usually are written," <u>Hostcentric Tech., Inc. v. Republic</u>

Thunderbolt, LLC, 2005 WL 1377853, at *9 (S.D.N.Y. June 9, 2005), the Court concludes

that "this factor, viewed in the light most favorable to [Plaintiffs], is neutral as to whether

the parties intended to be bound only by a writing." Powell, 497 F. 3d at 131.

### 5.   Judgment Dismissing Actions "Without Prejudice"

The fact that the judgments called for dismissal of the actions "without prejudice" is

immaterial to the determination of whether the parties had reached a binding oral

settlement agreement for "with prejudice" dismissals of the federal actions. See United

States v. $660,200, 423 F. Supp. at 30 ("I find it immaterial to the enforcement of this

settlement whether the docket entry for the settlement conference stated that the case

was dismissed with or without prejudice.")(citing Reich v. Best Built Homes, Inc., 895 F.

Supp. 47, 48, 50 (W.D.N.Y.1995) (enforcing settlement that was agreed to orally on the

record and "dismissed without prejudice")). The uncontradicted evidence indicates that the

oral representation to Magistrate Judge Peebles was that the parties had reached

settlement and that, *inter alia*, the federal court actions would be dismissed "with

prejudice" by a stipulation of discontinuance. The exchange of settlement documents

between the parties, both before and after the March 31, 2003 settlement conference,

provides further support for this proposition.  These documents, which were circulated

between the parties' attorneys, unequivocally indicated that the parties had reached an

agreement that the federal and state court actions, including Arquette II, would be

dismissed "with prejudice" by a Stipulation of Discontinuance.  There was  no request to

change this provision which remained in the final draft that was signed by all but one of the

Arquette Parties.

30

To the extent the dismissal judgments entered on March 31, 2003 stated that the dismissals were "without prejudice," the judgments could be read as inartfully dismissing the actions with the "without prejudice" language applying *only* to the three month period in which either the "with prejudice" Stipulations of Discontinuance would be filed or a motion would be made to revive the actions "upon cause shown that the settlement has not been completed and further litigation is necessary." See Pltf. L.R. 7.1(a)(3) Response, ¶ 10 ("[T]his Court retained jurisdiction to vacate the order and reopen the case within three months upon cause shown that the settlement had not been completed and further litigation was necessary.").   Regardless of any ambiguity that may exist in the judgment, that ambiguity does not trump the substance of the actual oral agreement reached by the parties.

### 6.   Conclusion

A balancing of the Winston factors tips decidedly in favor of the conclusion that a binding oral settlement agreement was reached on March 31, 2003 ending the litigation in this Court over the Tribal Court Judgment.   "[T]o protect the parties appearing before it, to preserve the integrity of an action, to maintain its ability to render a final judgment and to ensure the administration of justice," Haitian Ctrs., 817 F. Supp. at 337, the Court finds that the prior actions were finally dismissed by virtue of the oral settlement agreement entered on March 31, 2003.  See Mone, 2001 WL 1518263, at *1 (finding that the action had been settled even though the formal stipulation was never submitted where defense counsel wrote the court confirming a conversation with the judge's law clerk that the matter had been settled and stating that a formal stipulation would be drafted and forwarded to

31

the court within three weeks);  Van Ness, 129 A.D.2d at 932, 514 N.Y.S.2d at 571 (finding

that an out-of-court oral agreement to settle as case was binding even though defendant

never executed the general release and stipulation discontinuing the action forwarded by

defendant counsel).   Accordingly, because the subject matter of this action has been

asserted in a prior action and settled by an oral agreement to end that matter with

prejudice, Defendants' motion must be granted and this action dismissed.  The Court need

not, and does not, reach the alternative arguments for dismissal.

## III.    CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment [dkt.

# 45] is **GRANTED** and this action is **DISMISSED**.


**IT IS SO ORDERED**

DATED:  September 28, 2009



Thomas J. McAvoy
Senior, U.S. District Judge